SAVOIE, Judge.
This is a tort action brought by Elliott Danny Howze (plaintiff) for personal injuries sustained from a gunshot wound. The trial judge rendered judgment in favor of plaintiff, awarding $284,068.38 in damages. Defendant, Commercial Union Insurance Companies, has appealed. We reverse.
This suit arises out of an alleged accidental shooting which occurred on July 6,1983, in Livingston Parish, Louisiana. Plaintiff alleges that at the time of the accident he was driving a pickup truck owned by Lott Enterprises, Inc. and insured by defendant (hereinafter referred to as the Lott pickup truck). While rounding a turn, his father’s .45 caliber Colt automatic pistol allegedly fell from the sun visor, struck the floor of the truck and discharged, resulting in a serious bullet wound to plaintiff’s right leg.
Plaintiff was initially administered treatment at the emergency room of Dixon Memorial Hospital in Denham Springs around 9:45 p.m., and then transferred by ambulance to Our Lady of the Lake Regional Medical Center in Baton Rouge shortly before midnight. Plaintiff was placed in traction until July 12, at which time Dr. John Loupe surgically repaired his shattered femur. The bullet was not removed, however, and remains in his leg. He was discharged from Our Lady of the Lake on July 20, 1983.
*849 The alleged accident and injury to plaintiff was unwitnessed and the manner in which he was shot is disputed. Defendant contends that the shooting did not occur under the alleged circumstances and denies coverage for the accident under its insurance policy covering the Lott truck.
At trial, the parties called the following witnesses concerning the circumstances of the accident.
Plaintiffs Witnesses
Plaintiff testified that on July 6, 1983, he was driving through Port Vincent, Louisiana between 8:00 and 9:00 p.m. on his way home (Walker, Louisiana) from work. After spotting his father’s truck parked outside, he stopped at Fred’s Bait Shop (a bar and lounge) and drank some beers with his father. At trial plaintiff described this meeting as purely accidental and not prearranged. However, we point out that in a deposition taken five months prior to trial, plaintiff testified as follows:
Q. Where did you swap trucks?
A. Where did I swap trucks, right there at the bridge, there.
Q. So he had left the truck there:
A. Yeah, he left the truck and I just locked mine up and let the keys in it. He told me to come back and get it and take it. (Emphasis ours).
Plaintiff further testified that at approximately 9:00 or 9:30 p.m. he took his father’s keys, leaving the keys to his truck in the ignition; he then drove off in the truck that his father was driving, i.e., the Lott pickup truck.
Plaintiff testified that on his way home his father’s pistol fell from the sun visor, struck the floor of the truck, and fired once. The bullet passed through the seat and entered his right thigh. He then drove to the home of his cousin, Malcolm Howze, who lived only a few miles away. Malcolm Howze then drove plaintiff to Dixon Memorial Hospital.
Jerry Howze, plaintiff’s father, testified that Danny met him at Fred’s Bait Shop around 8:00 or 9:00 p.m. and that they drank together for about one or one and a half hours. They then “swapped keys” and he left in plaintiff’s truck to take a friend home in Denham Springs and then meet plaintiff later at Walker Tavern (another lounge). However, plaintiff never mentioned any intentions of meeting his father at another lounge as he testified that he was on his way home and that he might have stopped by the office to drop off some supplies.
Mr. Howze further testified that he had left his .45 caliber Colt automatic pistol in the Lott pickup truck above the sun visor. He stated that he sometimes would leave the gun cocked with the safety on, but could not remember if he had cocked the hammer of the gun before putting it on the visor. However, he did state that he always put the manual safety on if the hammer were cocked.
The gun was not made available at trial in response to defendant’s subpoena duces tecum. Mr. Howze stated that the gun had disappeared and that he could not locate it. Yet, only three and a half months prior to trial, Mr. Howze testified by deposition as follows:
Q. You said you’ve got three 45’s. Is there any way to distinguish one from the other, or do you know the particular gun that was involved in this accident? Can you pick it out now?
A. Yes, sir. I believe so.
Q. You still use that gun?
A. Yes, sir.
Q. By use I mean carrying it with you, maybe occasionally shooting it.
A. Yes, sir.
He further testified by deposition that the gun had never accidentally discharged or malfunctioned. Despite this testimony, Mr. Howze at trial stated that he was wrong and that he must have mistaken one of his other .45’s for the one that was allegedly involved in his son’s accident.
Earl Lott, co-owner of Lott Enterprises, Inc., testified on direct that “shortly after the accident,” approximately one to two weeks, he saw “a bullet hole in the seat... at the bottom and at the top of the seat” when Julius Lott (his brother) and Jerry Howze were with him at his place of busi *850 ness where the truck was kept after the accident. On cross-examination, Earl Lott admitted that he and Jerry Howze are distantly related and that he saw “a few bloodstains, but not excessive” on the seat when he viewed the truck approximately one to two weeks after the shooting.
Ralph Rowland, a hunting companion of plaintiff, testified that “around the first or middle of October,” 1983, plaintiff had shown him the “hole in the seat of his truck where he had got shot where he was sitting.” He then stated that he had not “seen the truck in a good while ... over a year at least” before the trial.
Malcolm Howze, plaintiff’s second cousin, testified on direct that plaintiff arrived at his house around 11:00 p.m. and stated “I’ve been shot.” Malcolm Howze then drove plaintiff in the Lott pickup truck to Dixon Memorial Hospital, approximately a ten minute trip, and drove the truck back to his house when plaintiff’s father arrived at Dixon. On cross-examination, he testified that he did not notice any bullet hole in the seat and that the truck was removed from his property the next day on July 7, 1983.
Lamar Blount, who purchased the Lott truck in December, 1984 or January, 1985, testified that he had never noticed any holes in the seat until they were pointed out to him a few days before trial.
Defendant’s Witnesses
Mr. Arthur Cooper, employed by the firm representing plaintiff herein, testified that he and another employee of the firm, Jeff Robert, went to the home of Lamar Blount on June 25, 1985, to inspect and take photographs of the truck. He testified that he got inside the truck and felt for the holes in the seat but determined that no bullet holes were present. He then stated that he, along with Sgt. Hughes, reinspected the truck approximately two weeks later after being told by an unspecified person that there was a bullet hole in the seat. Mr. Cooper testified that on his second inspection there was a bullet hole in the seat.
When asked if the pictures introduced into evidence were the only ones that he had taken, Mr. Cooper replied in the negative. At this time defense counsel informed the court regretfully that the remaining photographs “were in my file yesterday” but “they disappeared when I went out and looked at the truck with the court and plaintiff’s counsel.” However, on cross-examination, Mr. Cooper admitted that the “missing” photographs were “not appreciably” taken from any other angles than the photographs introduced in evidence. We find the photographs introduced to be nondeterminative of whether the holes existed on June 25, 1985.
More important is the testimony of Dr. Jeffrey Smith, the emergency room physician at Dixon who treated plaintiff immediately after the accident. Dr. Smith testified emphatically that plaintiff told him that he had been shot by an unknown assailant while hitchhiking. The hitchhiking scenario was also recorded under the history section of plaintiff’s emergency room medical record.[1] The transcript reflects the following testimony of Dr. Smith:
Q. Can you read us what the history is that you recorded?
A. Okay. It says that a 21 year old white male states hitchhiking on the road when he was shot by a single bullet by an unknown assailant. He was complaining of pain in his right thigh and being unable to move his leg. That was the history portion.
Q. He told you he was shot while hitchhiking by someone else?
A. Yes.
Q. Is there any doubt in your mind that he told you that?
A. No there’s not.
* * * * * *
*851 Q. Dr. Smith I am going to ask you one more time, are you certain here under oath Mr. Howze told you he was shot by an unknown assailant while hitchhiking?
A. I am certain. I remember distinctly asking at least twice. You know my job is to get the history from the patient, and what they tell me is what I write down.
Q. And where it says that he was alert what does that mean to you?
A. That means he was able to answer questions. He was oriented as to the situation ... time, person, place, etc. (Emphasis ours).
Finally, and most importantly, is the expert testimony of Sgt. Stanley Hughes, Supervisor of the Louisiana State Police Armory and a recognized expert in firearms. Sgt. Hughes supplied the court with the model gun (.45 caliber Colt automatic pistol) alleged to have been involved in the accident, as plaintiff failed to produce the actual weapon at trial. He then explained the various safety features of the gun.
For the purposes of his testimony, Sgt. Hughes assumed that there was a bullet in the chamber of the gun. First, Sgt. Hughes showed how a Colt .45 automatic cannot fire if the gun is either not cocked or only half-cocked because there is “a metal block in between the firing pin and the hammer of the gun.” He stated that the gun could not fire in this position (not fully cocked) even if all the safeties were overridden (off), including pulling the trigger.
Therefore, Sgt. Hughes next assumed that the gun was in a fully cocked position. He explained that when fully-cocked, a manual safety may be placed into position, and according to Sgt. Hughes: “At this point you can pull the trigger and the hammer will nto [sic] fall because this safety has blocked the disconnector, an internal part of the weapon, and it can’t fire.” Also, he testified that there is a grip safety on the grip of the gun which must be depressed (ordinarily by grasping the gun) before the trigger can be pulled. He testified that even if the grip safety were depressed ‘ [y]ou still have not overridden all of the safeties because the manual safety that is applied at full cock is still keeping the weapon safe even though the grip safety is in a depressed position” because “one cannot override the other.”
Finally, under the assumption that there was a bullet in the chamber, the gun was fully cocked, the manual safety was off, and the grip safety was somehow depressed, Sgt. Hughes testified that in order for the gun to fire, “one more element needs to take place, the trigger has to be pulled.” (Emphasis ours). Repeatedly, Sgt. Hughes emphasized the fact that even if all safeties were overridden, the gun will not fire unless the trigger is pulled. He added:
The trigger will not go by jarring or falling because of the configuration of the cocking notch in the hammer. It requires six and a half pounds pressure to the rear ... anywhere from five to six and a half pounds, for rearward motion on the trigger to make the gun fire even though all safeties are out of place ... something has to pull the trigger....”
On cross-examination, Sgt. Hughes admitted that the grip safety could be depressed by putting pressure on the tip of the hammer. He also admitted that it is possible for the gun to strike at such an angle that the grip safety would be depressed. However, he reiterated that depressing the grip safety alone will not fire the weapon; the trigger must be pulled if the gun is “sound,” i.e., functioning properly. Sgt. Hughes stated that in his opinion, the gun cannot fire falling from a sun visor to the floor of a pickup truck. Because he could not inspect the gun to find out why it went off, it was his opinion that somebody pulled the trigger.
The trial judge found as follows: (1) plaintiff was not shot while hitchhiking but was shot while he was in the truck; (2) Jerry Howze, plaintiffs father, was negligent in placing the cocked gun over the sun visor and not warning Danny of its presence; (3) Jerry Howze, having had the custody of the truck, was negligent in his use of it; (4) “it is more probable than not that *852 Danny Howze suffered injuries as a consequence of Jerry Howze’s negligence in leaving a cocked .45 over the sun visor of the vehicle owned by Lott Enterprise[s] ...” and the Colt .45 “fell to the floor, discharging, causing injuries to Danny Howze....” Plaintiff was awarded a total sum of two hundred eighty-four thousand sixty-eight and 38/100 dollars ($284,068.38), together with legal interest from date of judicial demand.
From this adverse judgment, defendant has suspensively appealed, assigning as error: (1) the trial court’s rejecting Dr. Smith’s testimony that plaintiff told him he was shot by an unknown assailant while hitchhiking; (2) finding that plaintiff was injured, while operating the Lott truck, by an automatic pistol which accidentally discharged when it fell from above the sun visor to the floor; (3) not accepting defendant’s firearms expert’s opinion that it is virtually impossible for the automatic pistol to fire without someone pulling the trigger; and (4) “awarding grossly excessive damages.”
Dr. Smith’s Testimony
Defendant contends that the trial court committed an error of law by rejecting the testimony of Dr. Smith concerning the statements made by plaintiff as to the occurrence of the accident. In its oral reasons for judgment, the trial judge stated:
Though the court has a lot of respect for Dr. Smith, Dr. Smith I am satisfied may have testified accurately and honestly when he said Danny Howze said that he was hitchhiking and some unknown assailant shot him. I have no reason whatsoever to believe that Dr. Smith was testifying as to what he was concluding and what his notes said. There is one simple rule of law .. and both of you can recite that verbatim because it is elementary .. that which is testified to in open court under sworn oath precedes and overcomes that which is out of court unsworn statements. That is just the elementary rule of law. So I must weigh it out. Not only must I weigh it out, I’ve got to take into consideration Malcolm Howze’s statement. He said Danny drove up in his truck, and if Danny drove up in his truck I don’t see how he was hitchhiking.... The court doesn’t quite fathom the hitchhiking ... now he could have said that, and the court as it has said doesn’t dispute Dr. Smith, but the evidence that has been before the court today indicates that Danny Howze was driving his truck. So the Court must reach a conclusion that he wasn’t shot while he was hitchhiking, but he was shot while he was in the vehicle. (Emphasis ours).
We find that the trial court committed manifest error in holding that he “must weigh it [Dr. Smith’s testimony] out.” While it is true that unsworn out-of-court statements cannot be used as evidence of their substantive content, the Louisiana rule on impeachment allows prior inconsistent statements to be admitted for impeachment purposes. Nami v. Peninsular Fire Insurance Company, 355 So.2d 1036 (La. App. 4th Cir.1978). Plaintiff’s prior inconsistent statements can be used to refute his later sworn testimony as being untrustworthy of belief, but not to prove the truth of the statements. Thus, the trial court was overly broad in stating that sworn testimony in court “overcomes and precedes” out of court unsworn testimony. Accordingly, the trial judge erred in failing to view the statements in their proper light, i.e., for impeachment purposes.
Also, we find error in the trial court’s logic. Simply because the court found that plaintiff was not hitchhiking does not mean that it must reach the conclusion that he was shot while in the truck. The two versions are not logical contradic-tories, such that the falsity of one would entail the truth of the other. Rejection of the unsworn statement does not necessitate acceptance of the sworn testimony. The statements are merely contraries: they cannot both be true but they could both be false.
Sgt. Hughes’ Testimony
Defendant further contends that the trial court erred in not accepting Sgt. Hughes’ expert opinion that it is virtually *853 impossible for the automatic pistol to fire without someone pulling the trigger. We agree.
In Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200, 1203-1204 (La.App. 1st Cir.1982), writ denied, 429 So.2d 133 (La.1983), we stated the standard for assessing expert testimony, in pertinent part, as follows:
The finder of fact, be it judge or jury, should assess the credibility of witnesses, expert or lay, to determine the most credible and realistic evidence.... In reaching conclusions, the finder of fact need not accept all of the testimony of any witness as being true or false and may believe and accept a part or parts of a witness’ testimony and refuse to accept any part of parts thereof- The opinions of expert witnesses are not binding on the finder of fact and are to be weighed the same as any other evi-dence_ The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and the facts upon which the opinion is based. The fact finder’s evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong_ (Emphasis ours).
After a careful review of Sgt. Hughes’ testimony, we find the trial court’s evaluation of his testimony to be clearly wrong. In its oral reasons for judgment, the trial court states:
Now the court really respected Sgt. Hughes ... respected his expert testimony, and was happy to have made him an expert, because he is knowledgeable about weaponry. However Mr. Pardue in his cross examination of Mr. Hughes brought out for some reason ... I’m not sure why he didn’t bring it out, but he had testified emphatically that the weapon couldn’t be fired unless the handgrip or the safety on the handgrip was pushed in when you were gripping it. Mr. Pardue proved by simple logic, and Hughes agreed with him, that the hammer could be pushed back further and that this could bypass the safety mechanism even though Mr. Hughes said there would have to be five to six and a half pounds of pull on the trigger it makes me have to question his expertise, or his full revelation, and I don’t think he in any way intentionally deceived the court. I think this might have been something that just slipped his mind.
We find Sgt. Hughes to be highly qualified as an expert in firearms and his unre-futed testimony is highly credible. We find no reason for the trial court to question his expertise because of the showing by plaintiff’s counsel that the grip safety may be depressed by putting pressure on the tip of the hammer. He admitted that the safety could be depressed in that manner, but that it will not fire simply because the safety is overridden. Also, he had assumed earlier that the grip safety could be depressed, when he testified that the trigger still must be pulled to fire the gun. He made it quite clear that the gun will not fire simply because all of the safeties are overridden. The trigger must be pulled. A jarring or falling will not fire the weapon.
Trial Court’s Finding of Fact
Based on the testimony of Dr. Smith and Sgt. Hughes, defendant submits that the trial court erred in finding that plaintiff was injured, while operating the Lott truck, by an automatic pistol which accidentally discharged when it fell from the sun visor to the floor. We agree.
Mr. Howze testified that he does not remember if he cocked the gun, but that he always puts the manual safety on if he does cock it. However, if we assume all of the facts in favor of plaintiff, i.e., that the gun had a bullet in the chamber, that it was fully cocked, that the manual safety was off, that the grip safety was somehow depressed, and that it fell from the visor, we are still unable to find that it is more probable than not that the gun would discharge without the trigger being pulled. Of course, we must also assume, as did Sgt. Hughes, that the gun was “sound,” or not defective. If the gun discharged due to some defect in the weapon, then it was plaintiffs burden to prove such a defect. *854 As plaintiff failed to produce the gun at trial, no such burden of proof was met.
Thus, we find that plaintiff failed to prove by a preponderance of the evidence that he was injured in the manner alleged. This finding pretermits any discussion of defendant's assignment of error regarding damages.
For the above reasons, the judgment of the trial court is reversed. All costs of this appeal are to be borne by plaintiff.
REVERSED.

. It is interesting to note that plaintiff testified under oath that one month prior to this accident he was treated at Dixon Memorial Hospital for a head injury. He gave a history of having been mugged by persons unknown while changing a flat tire. The muggers took nothing from him. Plaintiffs wife, Ramona, also testifying under oath about this same head injury, stated that plaintiff had been injured at work. Her testimony reflected no knowledge of any mugging.