582 So.2d 242 (1991)
Burris Jerome LANDRY
v.
John DOE, d/b/a Ramah Truck Stop and Millers Casualty Insurance Company of Texas.
No. CA 89 0857.
Court of Appeal of Louisiana, First Circuit.
April 4, 1991.
Rehearing Denied June 5, 1991.
Writs Granted October 4, 1991.
*243 Michael C. Palmintier, Baton Rouge, Larry Bossier, Grosse Tete, for plaintiff Burris J. Landry.
Raymond C. Jackson, III, Lafayette, James P. Dore, Plaquemine, for defendants John Doe, d/b/a Ramah Truck Stop and Millers Cas. Ins. Co. of Texas.
Before EDWARDS, WATKINS, CARTER, CRAIN and LeBLANC, JJ.
LEBLANC, Judge.
This appeal involves a three-wheel motorcycle accident in which plaintiff, Burris Jerome Landry, was injured in the parking lot of the Ramah Truck Stop located in Ramah, Louisiana. Plaintiff initially filed suit against "John Doe, D/B/A Ramah Truck Stop", Millers Casualty Insurance Company of Texas, which provided general liability insurance to Sam and Joseph J. Morrow (apparently the lessors of the truck stop), D/B/A Ramah Truck Stop and S & J's Wrecking Service. Plaintiff subsequently amended his petition by excluding "John Doe D/B/A Ramah Truck Stop" as a defendant. Thus, the insurance company is the only remaining defendant.
The following pertinent testimony was presented at trial: Plaintiff testified that on October 23, 1985, he and his friend, Aaron D. Weatherford each drove a three-wheel motorcycle from Mr. Weatherford's house to the Ramah Truck Stop, which was located between Frontage Road near Grosse Tete, Louisiana, and a levee. According to plaintiff's testimony, he and Mr. Weatherford were headed to the levee. Plaintiff testified that he and Mr. Weatherford travelled down Frontage Road. They travelled on the side of the road where there was a shoulder and travelled on the road where there was no shoulder. Plaintiff acknowledged that he was not wearing a helmet. Plaintiff also testified that there was drizzling rain at the time he and his friend reached the truck stop. Plaintiff explained that from the side of Frontage Road, he crossed over the road and entered the parking lot of the truck stop in order to purchase a coke at the truck stop restaurant. As he was riding across the parking lot, plaintiff contends that the front of his three-wheeler hit a hole causing the front end of the three-wheeler to come up and flip over. Plaintiff acknowledged that he did not know the size of the hole. Plaintiff described the parking lot to be composed in part by gravel and in part by cement. He contends that the accident occurred on the cemented portion of the parking lot. Plaintiff testified that he was not travelling fast when the accident happened; he estimates that he was travelling ten to fifteen miles per hour. Plaintiff further testified that he was driving in a straight line through the parking lot and that the three-wheeler was not sliding before it flipped. However, plaintiff indirectly acknowledged that his previous deposition testimony on this point had been different. His trial testimony was as follows:
Q "... again in your deposition, do you remember telling me that you don't know if you were sliding or going straight?
A I remember that I was going straight because that'sI knew where I was going.
Q Page 52, line 11, I'm going to read the question. (Reading from deposition) "Do you have a recollection? Can you describe the movement of the vehicle before you hit the hole? In other words was it proceeding ahead, straight ahead or was it sliding?" Line 16, answer, "I really don't know. I really don't know." *244 Did your memory come back to you after this deposition about whether you were sliding?
A Yes.
. . . . .
Q Do you know when you learned when you remembered that you weren't sliding? When was that? How long before this court trial today?
A I don't remember just exactly when it was, you know. I can't pinpoint when I remembered.
Plaintiff also acknowledged on cross-examination that he knew how to rare up a three-wheeler motorcycle on its back two wheels and that he had performed this maneuver on dates previous to the October 23, 1985 accident. He denied performing this maneuver on the date of the accident in question.
Mr. Aaron Weatherford's account of the accident was similar to plaintiff's description. Weatherford testified that he and plaintiff planned to ride three-wheelers to the truck stop to get a cold drink and, then, were going to ride on the levee. Neither he nor plaintiff were wearing helmets. Weatherford described that there was misty rain at the time of the accident. Weatherford testified that when he and plaintiff entered the truck stop parking lot, they were travelling slowly. Weatherford also testified that when plaintiff entered the parking lot "he slid a little bit, but you know, I was trying, you know, to watch where I was going, too. The last I looked at him, he looked like he straightened out to me." Weatherford described the accident as follows: "The last time I looked at him, it looked like he straightened out and everything. And I looked back, and when I looked back, I seen the front end of the three-wheeler come up. And, that's when he started flipping." Weatherford testified that he did not see plaintiff hit a hole. He stated that he did not know whether plaintiff "hit a hole, hit a big chunk of the cement or what he hit". Weatherford stated that he did not see plaintiff rear up the three-wheeler on its back wheels and that as far as he could see, plaintiff was driving safely. Weatherford further testified that the approximate area of the accident was where the gravel ended and the cement started. Weatherford explained that plaintiff landed in a big hole that was full of water. He also noticed numerous other holes in this area of the parking lot that were filled with water.
During cross-examination of Mr. Weatherford, he acknowledged that he may have made a previous out-of-court statement that plaintiff had lost control of his vehicle while on the (Frontage) road. The questioning went as follows:
Q Do you recall telling them [Kenneth Muse and Toni Foret] that he [plaintiff] lost control on the road?
A I told them that he turned off the road.
Q Do you recall telling them that he lost control of his vehicle on the road?
A No, sir.
Q You deny that statement?
A No, I don't deny it. I might have told them that. You know, like I say, everytime I went over there, they always asked me something about it. Like I say, I might have been in the wrong mood. There's no telling whhat (sic) I may have told him.
Also during cross-examination, Weatherford was questioned regarding whether he saw plaintiff's three-wheeler slide before the accident occurred:
Q Mr. Weatherford, it's true that Mr. Landry had sled (sic) twenty or twenty-five feet on the three-wheeler before the accident, is that right?
A I don't know exactly how far he slid. Like I say, when he turned and normally when you turn a three-wheeler, it's going to slide a little bit.
Q But, that's your best estimate of how far he slid?
A I can't say exactly how far he slid.
Q I'm not asking for exactness. Isn't it true that you have given that estimate in the past?
A I don't remember if I said twenty or twenty-five feet or whatever.

*245 Q You don't deny saying that?
A No, I don't deny it.
. . . . .
Q Do you recall giving a statement to Patty Harmony (sic), the investigator for the insurance company?
A On the phone?
Q Yes, sir.
A Yes, sir, I do.
Q You have had a chance to review that statement, haven't you?
A Well, you just gave it to me just earlier. I went back over it a little bit.
Q Do you recall being asked this question by Ms. Carmen: "Okay, now do you know what area of the gravel he went across, about how many feet of gravel he went across?" Your answer, "When he started sliding, I don't know the speed with them three-wheelers, and the tire was full. They got so much air in them, when they start sliding, they just speed up. I imagine he slid, I don't know. He didn't slide no long way, about, I guess, around twenty to twenty-five feet, something like that." Do you remember giving that?
A That's how far he went, you know, before it flipped over backwards.
Q Do you remember giving that statement that I just read?
A Yes, sir.
Q Is that your best recollection now?
A Well, I'm not going to say he slid that far. I say, that's how far he went when he turned off the road and started flipping.
Q At what point did Mr. Landry start to slide? How far off of the road or on the road was he? Where was he when he started to slide?
A Like I say, when he went to turn in and normally when you turn, you are going to slide a little bit. When he turned, he slid a little bit and went on in the gravel and then, you know. And I was, you know, I was watching where I was going, too. And when I looked back at him, he looked like, you know, the three-wheeler was straightened out and everything to me.
Q Was there a slope where he went down?
A Very little.
Q A slight incline?
A Yes, sir.
Q When he went down that incline, did he go down at an angle or did he go straight down? Was he going at an angle?
A He went straight.
Q Mr. Weatherford, was he fishtailing? Do you know that I'm saying?
A No sir, he wasn't fishtailing. He was just sliding a little bit.
Janet Kline, who testified that she was a good friend of plaintiff, also testified that she witnessed the October 23, 1985 accident as she was standing at the glass front doors of the truck stop restaurant, One Eyed Jack's Restaurant. From this vantage point, she said she could see the entire parking lot. When she first saw plaintiff, he was crossing the road and entering the parking lot. She described that plaintiff was sitting on the three-wheeler, was driving slow and straight and was not doing "wheelies". Ms. Kline further explained that after plaintiff entered the parking lot, she saw "the front of the three-wheeler come up off the ground and B.J. [plaintiff] fell off the back of the three-wheeler and hit the concrete and the three-wheeler flipped."
Ms. Kline described that the parking lot was covered with water. She also testified that she had previously seen potholes in the area where the accident happened.
Dora King also testified that she witnessed the three-wheeler accident. At that time, she worked at One Eyed Jack's Restaurant. She explained that she knew plaintiff as a patron at the restaurant; she did not know him personally. Ms. King also claimed to have witnessed the accident while standing at the glass front doors of the restaurant. Ms. King described that plaintiff was travelling at a "normal, *246 straight, slow speed" when plaintiff went down the slope and then "he hit something and the bike flipped and it turned two to three times and he fell off". Ms. King testified that plaintiff was sitting on the three-wheeler and driving about five to ten miles per hour when the accident happened. However, on cross-examination, Dora King conceded that she did not remember how fast plaintiff was travelling prior to the accident. Ms. King further testified that she did not see plaintiff do anything at all to make the front end of the three-wheeler pop up. Ms. King also testified that there were potholes on the premises.
Ben Smith also testified that he was a friend of plaintiff. On the afternoon that the accident occurred, Mr. Smith was at the truck stop restaurant. He described that it had been raining that day and the ground was wet. He saw plaintiff on the gravel portion of the parking lot before the accident occurred. He saw plaintiff enter the parking lot and then turn around and drive back towards the road. According to Mr. Smith, plaintiff was standing up on the three-wheeler when he saw plaintiff in the parking lot. However, Mr. Smith testified that he did not see the accident. He heard Ms. Kline make a comment that "the boys flipped on the three-wheeler" and went out towards plaintiff. Smith could not remember exactly how much time had passed between the time that he saw plaintiff standing on the three-wheeler and the time that the accident actually took place. Mr. Smith also testified that he had seen plaintiff "pop a few wheelies or peel out" on occasions prior to October 23, 1985.
Mr. Kenneth Muse worked at the truck stop for a six month period at some time subsequent to the date of the accident. He testified that Weatherford volunteered information to him about the accident. Muse testified as follows:
... he [Weatherford] told me that he was riding along side of B.J. He [plaintiff] come (sic) from around the curve and got off on the gravel road, the gravel part of the parking lot, and he noticed this young girl on the side. That's when he started messing around with his bike causing it to fishtail and stuff, and he lost control of it. And, that's when he flipped it.
Mr. Charles Fitzgerald, an employee and former manager of the truck stop, testified regarding the maintenance of the truck stop parking lot. He explained that one of the truck stop employees swept the parking lot to prevent water accumulation. Holes in the parking lot were filled with limestone every couple of months. Fitzgerald acknowledged there had been a problem with potholes in the general area where plaintiff's accident occurred.
Fitzgerald also said he often saw plaintiff riding his three-wheeler in the truck stop parking lot; he said he saw him about three to four times a week. Fitzgerald described that plaintiff would enter in the concrete parking lot and pass under the truck stop canopy which covered the gas pump isles and pass on the side of the restaurant. He stated that plaintiff would "be going through pretty fast.... I would say between 35 [mph] and 40 [mph]." Fitzgerald also explained that plaintiff used the truck stop air pumps quite often. Fitzgerald stated that he saw plaintiff do "wheelies" in the parking lot "pretty often." He explained, "[J]ust about any time he would get air at the pumps, he would do some type of "wheelie" around the pumps."
Mr. William L. Kimball, Jr., a previous employer of plaintiff, testified that he and plaintiff had previously ridden three-wheelers together. He explained that when they rode three-wheelers in the mud, they would spin out and perform wheelies. He testified that he never saw plaintiff cut up while driving on the road.
Mr. Albert Dugas, a deputy sheriff and school bus driver for Iberville Parish, stated that he observed plaintiff driving his three-wheeler about one week prior to the accident. Mr. Dugas had stopped his bus to drop off some school children. He witnesses plaintiff operating the three-wheeler on the public roads. He described that plaintiff was "popping a wheelie" on his back wheels and failed to stop when Dugas put his school bus stop signs out.
*247 Officer Joseph C. Scott investigated the accident for the Iberville Parish Sheriff's Department. He testified he found plaintiff lying in the parking lot approximately fifteen feet from the road and gouge marks about five feet from the road "where the road goes sort of like on a slant" into the parking lot. He also stated that he did not notice potholes at the time he investigated the accident because there was water in the parking lot. Officer Scott said he did find potholes in the parking lot when he returned a few days later.
Based on the above testimony, the jury determined that the Ramah Truck Stop was negligent or strictly liable and that this negligence proximately caused plaintiff's accident and injuries. The jury assessed the Ramah Truck Stop's percentage of negligence to be seventy-five (75%) percent. Plaintiff was also found guilty of negligence which proximately caused the accident and injuries. Plaintiff's negligence was assessed at twenty-five (25%) percent. The jury awarded Two Hundred Seventy Thousand ($270,000.00) Dollars for plaintiff's total damages less medical expenses. The jury also awarded Six Thousand Seven Hundred Seventy-seven ($6,777.00) Dollars for past medical expenses and Five Thousand ($5,000.00) Dollars for future medical expenses. Based on this verdict, and after reduction by plaintiff's percentage of negligence, judgment was rendered in favor of plaintiff and against defendant in the amount of Two Hundred Eleven Thousand Three Hundred Thirty-Three ($211,333.00) Dollars.
Defendant, Millers Casualty Insurance Company of Texas, has appealed contending that the trial court erred in failing to admit a prior inconsistent statement of Dora King into evidence.[1]
During cross-examination, Dora King was asked if she recalled giving a statement to an insurance investigator, Peg Harmon, over the phone on February 27, 1986. She answered, "I know I gave a statement. I don't remember about over the phone. Someone came to my job and I gave a statement." A transcription of the phone conversation was presented to Ms. King and she was questioned regarding the transcription as follows:
Q Specifically, Ms. King, do you recall being asked this question by the investigator? (Reading from statement) "Okay, now, did you see it before it started flipping at all?" Do you recall that your answer was ...
Q Do you recall that question being asked of you?
A Could you repeat the question?
Q Yes, ma'am. "Okay, now, did you see it before it started flipping at all?"
A No.
. . . . .
Q Do you recall, Ms. King, your answer being to that last question, "No, uh-huh. I just happen to look up and it had started flipping when I seen it and he flipped off and the next thing I know he had landed on the side of it." Do you recall that?
A No, I don't remember anything about that paper at all.
Peggy Harmon Thomas testified outside the presence of the jury that she telephoned Dora King at One-Eyed Jack's Restaurant, Dora King's place of employment, and tape-recorded the phone conversation. Ms. Thomas further testified that the woman with whom she spoke identified herself as Dora King. The speaker also provided a home address and a personal phone number. Ms. Thomas stated that Dora King "explained to me that she was standing at the window at the restaurant; and that she looked up in time to see B.J. [plaintiff] flipping." Ms. Thomas also identified a cassette tape as being the tape on which *248 she recorded Dora King's February 27, 1986 statement. The tape is identified with Dora King's name, the date and one of Ms. Thomas' file numbers.
When the jury returned, defense counsel attempted to introduce Thomas' testimony regarding what Dora King had told Thomas about the accident. The following exchange took place:
Q [by defense counsel] Mrs. Harmon, in the course of your investigation, did you ever have a chance to contact Dora King?
A Yes, sir.
Q When was that?
A October 23,February 27, 1986.
Q And, how did you contact her?
A By phone. I called her at One-Eyed Jack's Restuarant (sic).
Q Did you ask for Ms. King's,any pertinent information like her address?
A Yes, sir.
Q What was her address?
Mr. Palmintier [plaintiff's counsel]: Your honor, we would object as to hearsay with regard to anything that this witness might testify to about what someone else who is not in court told her.
The Court: Sustained.
Q Did you talk to Dora King about the accident?
A Yes, sir.
Q What did Dora King tell you about the accident?
Mr. Palmintier:
Same objection, Your Honor.
The Court:
Sustained.
Thereafter, defense counsel attempted to introduce into evidence the cassette tape. Upon objection by plaintiff's counsel, the trial court ruled that "the tape is inadmissible because it has not been properly identified as being the voice of Dora King." The tape was proffered by defense counsel. The following is the pertinent language of the taped statement.
Q [Peggy Harmon Thomas]Okay, now did you see the mopedwas this a three-wheeler?
A [Purported voice of Dora King]uh huh [affirmative response]
Q Now did you see it before it started flipping at all?
A No, uh uh [negative response]. I just happened to look up, and when it started, it had started flipping when I seen it and he flipped off and the next thing I know he [plaintiff] had landed beside of it.
We find the trial court erred in excluding the evidence at issue. Regarding the issue of authentication, we think the circumstantial evidence proffered by defendant was sufficient to make out a prima facie case from which the jury could have concluded that Dora King was a party to the taped conversation and that the tape was authentic. See United States v. Register, 496 F.2d 1072 (5th Cir.1974), cert. denied, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975); Palos v. United States, 416 F.2d 438 (5th Cir.1969), cert. denied, 397 U.S. 980, 90 S.Ct. 1107, 25 L.Ed.2d 391 (1970). In the present case, Ms. Thomas telephoned the restaurant where Ms. King worked and spoke to a woman who identified herself as "Dora King" and volunteered personal information about Dora King. Ms. Thomas also identified the proffered tape as the one she used to tape the telephone conversation.
Dora King's trial testimony also establishes that a proper foundation was laid for the introduction of Ms. King's previous statement. Ms. King testified that she did recall giving a statement regarding the accident to an insurance investigator. However, when a reference was made to the specific content of the statement, Ms. King failed to admit she had made the statement. See Schexnayder v. Zurich Insurance, 257 So.2d 764 (La.App. 1st Cir.1972).
Furthermore, a prior inconsistent statement of a witness is admissible to impeach the witness. April v. Millers Mutual Fire Insurance Co. of Texas, 273 So.2d 50 (La.App. 4th Cir.1973). The admission of the statement is limited to impeachment purposes only and cannot be used as evidence of the substantive content *249 of the prior statement. Marshall v. Duncan, 542 So.2d 691 (La.App. 4th Cir.1989), writ denied, 544 So.2d 410 (1989); Howze v. Commercial Union Ins. Companies, 506 So.2d 847 (La.App. 1st Cir.) writ denied 508 So.2d 72 (1987). Furthermore, tape recordings may be admissible as prior inconsistent statements. Mathews v. Mathews, 459 So.2d 546 (La.App. 5th Cir. 1984), writ denied, 462 So.2d 650 (1985).
Dora King testified at trial that she had witnessed events preceding the flipping of the three-wheeler. She described that plaintiff was travelling at a "normal, straight, slow speed" and was seated on the three-wheeler prior to the accident. Thus, Dora King's earlier statement to Ms. Thomas that she did not see the three-wheeler before it started to flip is clearly a prior inconsistent statement. If the jury had been allowed to hear this testimony, the jury, within its bounds, may have concluded that Dora King's testimony should have been disregarded in its entirety. See Schexnayder, 257 So.2d at 767.
If the jury elected to set aside Dora King's testimony, it then may have decided to place less weight on the testimony of witnesses that appeared to corroborate Dora King's testimony, such as the testimony of plaintiff's friends that plaintiff was driving slow and straight at the time of the accident. At this point, the jury may have placed greater weight on the testimony that was adverse to plaintiff, such as the testimony of Ben Smith who testified he saw plaintiff standing on the three-wheeler in the parking lot prior to the accident. Thus, although the jury could have rendered the same verdict had it been allowed to hear the proffered testimony, we cannot say that the jury would have rendered the same verdict. See McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986). Since the proffered testimony may indeed have changed the outcome of the trial, we find the jury verdict was tainted by the trial court's error and must be disregarded. Id.
Generally, at this point, an appellate court should make an independent review of the record and determine which party should prevail by a preponderance of the evidence. McLean, supra; Gonzales v. Xerox Corporation, 320 So.2d 163 (La. 1975). However, in Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, 708 (La.1980), the Supreme Court instructed the appellate courts as follows:
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzalez [v. Xerox Corporation, 320 So.2d 163] should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial.
See also, Tabor v. Doctors Memorial Hosp., 501 So.2d 243 (La.App. 1st Cir.1986), appeal after remand, 554 So.2d 849 (La. App. 1st Cir.1989); rev'd in part on other grounds, 563 So.2d 233 (1990).
In the present case, in order to determine precisely how the accident occurred and what caused it, decisions regarding the credibility of numerous witnesses will be required. The serious questions of credibility, along with the conflicting testimony presented in the record, convince us that a remand for a new trial would best serve the interests of justice. Id.
For these reasons, the judgment of the trial court is reversed and set aside. The case is remanded for a new trial in accordance with the views expressed herein. All costs are to await final disposition of the matter.
REVERSED AND REMANDED.
*250 CRAIN, J., concurs in the result. The trial court wrongfully refused to allow impeachment through a witness on the stand when a proper foundation had been laid. It is not necessary to introduce the tape to determine error.
CARTER, J., dissents.
EDWARDS, J., dissents with reasons.
EDWARDS, Judge, dissenting.
I agree that the tape was admissable and that when a trial court makes a consequential error in the exclusion of evidence, no weight should be accorded the judgement which implements the jury verdict. However, based upon a review of this record as a whole, the exclusion of the tape under the circumstances was not a consequential or fatal error. Defendant's counsel was allowed to question Ms. King extensively concerning the alleged prior inconsistent statements. The tape itself is garbled and much of it is unintelligible. The jury had before it sufficient information on which to make a reasonable evaluation of credibility of the testimony of Dora King. The judgement in favor of the plaintiff should be affirmed.
NOTES
[1] Defendant also raised the following assignments of error which we pretermit in light of our finding on this assignment:

1.) The jury committed manifest error in finding the truck stop to be negligent and/or strictly liable for the accident.
2.) In the alternative, the jury committed manifest error in its allocation of fault.
3.) The trial court committed manifest error in refusing to admit a prior inconsistent statement of Janet Kline.