LeBLANC, Judge.
This personal injury case is on remand from the Louisiana Supreme Court, 586 So.2d 543 (La.1991). This court has previously rendered an opinion in this case[1], in which we found that the trial court erred in excluding certain evidence .offered to impeach a witness. Based on this error, we concluded that the jury’s verdict was tainted by the trial court’s error and should be disregarded. We further determined that due to the serious questions of credibility involved in this case, a remand for a new trial was proper rather than a de novo determination by this court regarding liability. Writs were granted by the supreme court[2]; the supreme court vacated this court’s judgment and remanded the case to this court for a decision on the merits of the case. Accordingly, since we remain of the opinion that the trial court’s error interdicted the jury’s liability determinations, we vacate the jury’s findings on liability and will determine the merits of this case based on an independent review of the record. McLean v. Hunter, 495 So.2d 1298 (La.1986); Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975).
This case involves a three-wheel motorcycle accident in which plaintiff, Burris Jerome Landry, was injured in the parking lot of the Ramah Truck Stop located in Ramah, Louisiana. Plaintiff initially filed suit against “John Doe, D/B/A Ramah Truck Stop” and Millers Casualty Insurance Company of Texas, which provided general liability insurance to Sam and Joseph J. Morrow, operators of the truck stop.[3] Plaintiff subsequently amended his petition to exclude “John Doe D/B/A Ra-mah Truck Stop” as a defendant. Thus, the insurance company is the only remaining defendant.
The following pertinent testimony was presented at trial: Plaintiff testified that on October 23, 1985, he and his friend, Aaron D. Weatherford, each drove a three-wheel motorcycle from Mr. Weatherford’s house to the Ramah Truck Stop, which was located between Frontage Road near Grosse Tete, Louisiana, and a levee of the Atchafalaya Basin. According to plaintiff’s testimony, he and Mr. Weatherford travelled down Frontage Road and were headed to the levee. Plaintiff acknowledged that he was not wearing a helmet. He testified that there was drizzling rain at the time he and Weatherford reached the truck stop. Plaintiff explained that from the side of Frontage Road, he crdssed over the road and entered the parking lot of the truck stop in order to purchase a coke at the truck stop restaurant. Plaintiff contends that, as he was riding across the parking lot, the front of his three-wheeler *16 hit a hole causing the front end of the three-wheeler to rise up and flip over. Plaintiff described the parking lot as being composed in part by gravel and in part by cement. He contends the accident occurred on the cemented portion of the parking lot. Plaintiff testified that he was not travelling fast when the accident happened; he estimates that he was travelling ten to fifteen miles per hour. Plaintiff further testified that he was driving in a straight line through the parking lot and that the three-wheeler was not sliding before it flipped. However, plaintiff indirectly acknowledged that his previous deposition testimony on this point had been different. His trial testimony was as follows:
Q ... again in your deposition, do you remember telling me that you don’t know if you were sliding or going straight?
A I remember that I was going straight because that’s — I knew where I was going.
Q Page 52, line 11, I’m going to read the question. (Reading from deposition) “Do you have a recollection? Can you describe the movement of the vehicle before you hit the hole? In other words was it proceeding ahead, straight ahead or was it sliding?” Line 16, answer, “I really don’t know. I really don’t know. Did your memory come back to you after this deposition about whether you were sliding?
A Yes.
[[Image here]]
Q Do you know when you learned— when you remembered that you weren’t sliding? When was that? How long before this court trial today?
A I don’t remember just exactly when it was, you know. I can’t pinpoint when I remembered.
Plaintiff also testified that he had ridden on a three-wheel motorcycle in the truck stop parking lot on previous occasions.
Mr. Aaron Weatherford’s account of the accident was similar to plaintiff’s description. Weatherford testified that he and plaintiff planned to ride three-wheelers to the truck stop to get a cold drink and, then, were going to ride on the levee. Neither he nor plaintiff were wearing helmets. Weatherford described that there was misty rain at the time of the accident. Weatherford testified that when he and plaintiff entered the truck stop parking lot, they were travelling slowly. Weatherford also testified that when plaintiff entered the parking lot, “he slid a little bit, but you know, I was trying, you know, to watch where I was going, too. The last I looked at him, he looked like he straightened out to me.” Weatherford described the accident as follows: “The last time I looked at him, it looked like he straightened out and everything. And I looked back, and when I looked back, I seen the front end of the three-wheeler come up. And, that’s when he starting flipping.” Weatherford testified that he did not see plaintiff hit a hole. He stated that he did not know whether plaintiff “hit a hole, hit a big chunk of the cement or what he hit.” Weatherford stated that he did not see plaintiff rear up the three-wheeler on its back wheels and that as far as he could see, plaintiff was driving safely. Weatherford further testified that the approximate area of the accident was where the gravel ended and the cement started. Weatherford explained that plaintiff landed in a big hole that was full of water. He also noticed numerous other holes in this area of the parking lot that were filled with water.
During cross-examination, Weatherford was questioned regarding whether he saw plaintiff’s three-wheeler sliding béfore the accident occurred:
Q Mr. Weatherford, it’s true that Mr. Landry had sled [sic] twenty or twenty-five feet on the three-wheeler before the accident, is that right?
A I don’t know exactly how far he slid. Like I say, when he turned and normally when you turn a three-wheeler, it’s going to slide a little bit.
Q But, that’s your best estimate of how far he slid?
A I can’t say exactly how far he slid.
*17 Q I’m not asking for exactness. Isn’t it true that you have given that estimate in the past?
A I don’t remember if I said twenty or twenty-five feet or whatever.
Q You don’t deny saying that?
A No, I don’t deny it.
[[Image here]]
Q Do you recall giving a statement to Patty Harmony [sic], the investigator for the insurance company?
A On the phone?
Q Yes, sir.
A Yes, sir, I do.
Q You have had a chance to review that statement, haven’t you?
A Well, you just gave it to me just earlier. I went back over it a little bit.
Q Do you recall being asked this question by Ms. Carmen [sic]: “Okay, now do you know what area of the gravel he went across, about how many feet of gravel he went across?” You answer, “When he started sliding, I don’t know the speed with them three-wheelers, and the tire was full. They got so much air in them, when they start sliding, they just speed up. I imagine he slid, I don’t know. He didn’t slide no long way, about, I guess, around twenty to twenty-five feet, something like that.” Do you remember giving that?
A That’s how far he went, you know, before it flipped over backwards.
Q Do you remember giving that statement that I just read?
A Yes, sir.
Q Is that your best recollection now?
A Well, I’m not going to say he slid that far. I say, that’s how far he went when he turned off the road and started flipping.
[[Image here]]
Janet Hendricks Kline, who testified that she was a good friend of plaintiff, also testified that she witnessed the October 23, 1985 accident as she was standing at the glass front doors of the truck stop restaurant. From this vantage point, she said she could see the entire parking lot. When she first saw plaintiff, he was crossing the road and entering the parking lot. She described that plaintiff was sitting on the three-wheeler, was driving slow and straight and was not doing “wheelies”. Ms. Kline further explained that after plaintiff entered the parking lot, she saw “the front of the three-wheeler come up off the ground and B.J. [plaintiff] fell off the back of the three-wheeler and hit the concrete and the three-wheeler flipped.”
Ms. Kline also testified that she had seen plaintiff travel across the parking lot on his three-wheel motorcycle on previous occasions. She had seen efforts to repair the potholes only once or twice during the four years immediately prior to the accident, during which time she had worked at the truck stop restaurant.[4]
Ben Smith also testified that he was a friend of plaintiff. On the afternoon of the accident, Mr. Smith was at the truck stop restaurant. He described that it had been raining that day and the ground was wet. Before the accident occurred, he saw plaintiff driving the three-wheeler in the parking lot in the same general area where the accident later happened. He saw plaintiff enter the parking lot and then turn around and drive back towards the road; according *18 to Mr. Smith, plaintiff was standing up on the three-wheeler at that time. However, Mr. Smith testified that he did not see the accident. He heard Ms. Kline make a comment that “the boys flipped on the three-wheeler” and then he went outside towards plaintiff. Smith could not remember exactly how much time had passed between the time that he saw plaintiff standing on the three-wheeler and the time that the accident actually took place.
Mr. Charles Fitzgerald, an employee and former manager of the truck stop, testified regarding the maintenance of the truck stop parking lot. Holes in the parking lot were filled with limestone every couple of months. Fitzgerald acknowledged there had been a problem with potholes in the general area where plaintiff’s accident occurred. Fitzgerald also said he saw plaintiff riding his three-wheeler in the truck stop parking lot three to four times a week.
Officer Joseph C. Scott investigated the accident for the Iberville Parish Sheriffs Department. He testified he found plaintiff lying in the parking lot approximately fifteen feet from the road and gouge marks about five feet from the road “where the road goes sort of like on a slant” into the parking lot. He stated that he did not notice potholes at the time he investigated the accident because there was water in the parking lot, but he did find potholes in the parking lot when he returned a few days later.
Dora King, an employee of the truck stop restaurant, testified that she witnessed the three-wheeler accident, while standing at the glass front doors. She explained that she knew plaintiff as a patron who frequently came to the restaurant, but did not know him personally. Ms. King testified that plaintiff was travelling at a “normal, straight, slow speed” when plaintiff went down the slope and then “he hit something and the bike flipped and it turned two or three times and he fell off.” Ms. King testified that plaintiff was sitting on the three-wheeler and driving about five to ten miles per hour when the accident happened. However, on cross-examination, Dora King conceded that she did not remember how fast plaintiff was traveling prior to the accident. Ms. King further testified that she did not see plaintiff do anything at all to make the front end of the three-wheeler raise up. Ms. King confirmed that there were potholes on the premises.
In our previous opinion, we concluded that the trial court erred in failing to admit into evidence a prior inconsistent taped statement made by Dora King to Peggy Harmon Thomas. The statement was made in a telephone conversation between Ms. Thomas and Dora King. In this taped statement, Ms. King told Ms. Thomas that she did not see plaintiff on his three-wheel motorcycle before it started flipping. She explained that when she looked up, the three-wheeler had already started flipping.
Since we find that the taped statement should have been admitted into evidence and was, in fact, proffered by defense counsel, we now consider this evidence in our de novo review of the merits of this case. In light of this previous statement made by Dora King, we do not find her to be a credible witness and, accordingly, place no weight on her trial testimony.
Based on the evidence presented, we find that plaintiff proved by a preponderance of the evidence that, immediately prior to the accident, he was driving the three-wheel motorcycle across the truck stop parking lot at a slow rate of speed and that he was in control of the vehicle until it hit a hole in the parking lot. The evidence further establishes that the hole caused the three-wheeler to flip, thus resulting in injury to plaintiff.
We further find the record establishes that there were numerous potholes in the general area where the accident occurred. We conclude that the potholes in the parking lot constituted a defect which caused plaintiff’s accident and resulting injuries for which strict liability should be imposed on the owners or custodians of the parking lot.
The duty of an owner or person in custody of immovable property is stated in Farr v. Montgomery Ward and Co., Inc., 430 *19 So.2d 1141, 1143 (La.App. 1st Cir.), writ denied, 435 So.2d 429 (1983), as follows:
The owner, or person having custody, of immovable property has a duty to keep such property in a reasonable safe condition. He must discover any unreasonably dangerous condition on his premises and either correct the condition or warn potential'victims of its existence. This duty is the same under the strict liability theory of La.C.C. art. 2317 as under the negligent liability theory of La.C.C. art. 2315. The difference in proof between these theories of liability is that under La.C.C. art. 2315, it must be shown that the owner, or person in custody, either knew or should have known of the risk, whereas under La.C.C. art. 2317, a claimant is relieved of proving the defendant’s scienter. Under either theory of liability, the plaintiff has the burden of proving that: (1) the property which caused the damage was in the ‘custody’ of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises (breach of the duty); and (3) that the defect in the property was a cause in fact of the resulting injury. In both negligent and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Under either theory of liability, the court must decide if the risk which causes the injury is within the ambit of protection of the duty. [Citations omitted.]
Also see, Carter v. Bd. of Sup’rs of Louisiana St. Univ., 459 So.2d 1263 (La.App. 1st Cir.1984), writ denied, 462 So.2d 1248 (La.1985).
In the present case, it is undisputed that Sam and Joseph Morrow, who are insured by defendant, were the custodians of the parking lot. Furthermore, we find that the potholes in the truck stop parking lot created an unreasonable risk of harm to persons on the premises. The record establishes that three-wheel motorcycles were commonly used in the general area where the truck stop was located, and were commonly driven through the truck stop parking lot. Thus, we find that the parking lot should have been maintained in such a manner as to be safe for three-wheel motorcycle travelers, as well as being safe for those who travelled in larger vehicles. The risk of injury to a three-wheel motorcycle rider is within the ambit of protection of the duty of an owner or custodian to maintain his property in a reasonably safe condition. Additionally, we find that a preponderance of the evidence establishes that the potholes were a cause in fact of plaintiff’s accident and resulting injuries. Based on these conclusions, we find Sam and Joseph Morrow to be strictly liable pursuant to La.C.C. art. 2317 for the injuries sustained by plaintiff as a result of the defective parking lot. Thus, liability is imposed on the defendant insurance company.
However, we also conclude that plaintiff was negligent and that this negligence was also a cause of the accident. The evidence establishes that plaintiff often drove his three-wheel motorcycle through the truck stop parking lot and that he was a frequent patron of the truck stop restaurant. Thus, we find that plaintiff either knew or should have known of the numerous potholes that existed in that particular area of the parking lot and should have been careful to avoid these holes as he travelled across the parking lot, particularly due to the adverse weather conditions on the day of the accident. See, Landry v. State, 495 So.2d 1284 (La.1986); Roberts v. State, Through DOTD, 576 So.2d 85 (La.App. 2d Cir.), writ denied, 581 So.2d 685 (1991); Gardner v. Campbell, 532 So.2d 292 (La.App. 3d Cir.), writ denied, 534 So.2d 446 (1988). Additionally, we find that plaintiff was also negligent in failing to wear a safety helmet[5] while operating the three-wheeler, and that this failure to wear the safety helmet contributed to his head injuries.
*20 Since we have found fault attributable to both plaintiff and defendant’s insureds in this suit, we must next apportion the percentages of fault to each respective party. La.C.C. art. 2323. This apportionment is guided by the principles enunciated in Watson v. State Farm, Fire And Cas. Ins. Co., 469 So.2d 967, 974 (La.1985):
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed, [quoting the Uniform Comparative Fault Act, § 2(b)]
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Examining plaintiff’s conduct, we find that plaintiff should have been aware of the dangers presented by the holes in the parking lot and should have exercised greater caution in his operation of the three-wheeler. Plaintiff’s negligence in failing to maneuver his vehicle safely around the potholes and in failing to wear a safety helmet was a significant cause of the accident. Likewise, the defective condition of the parking lot was also a significant cause of the accident. All of the employees of the truck stop knew that there were potholes in the parking lot. However, the record establishes that a very minimal effort was made by the truck stop management to correct the problem. After weighing the factors addressed in Watson, we assign fifty (50%) percent fault to plaintiff and fifty (50%) percent fault to Sam and Joseph Morrow.
Accordingly, the jury’s award of damages [6] to plaintiff in the amount of $281,-777.00 is reduced by fifty (50%) percent. Judgment is rendered in favor of plaintiff, Burris Jerome Landry, and against defendant, Millers Casualty Insurance Company of Texas, in the amount of $140,888.50, plus legal interest. Each party is to pay one-half of the total costs incurred in the district court and this court.
JUDGMENT VACATED AND RENDERED IN PART; AFFIRMED IN PART.

. Landry v. Doe, 582 So.2d 242 (La.App. 1st Cir.1991).

. 586 So.2d 543 (La.1991).

. The record supports a finding that the truck stop and other improvements were built by Sam and Joseph J. Morrow on property which was leased by them from third parties not involved in this suit.

. Defendant contends that the trial court erred in refusing to admit a prior inconsistent statement of Janet Hendricks Kline into evidence. At trial, defendant attempted to introduce the following testimony of its investigatbr, Peggy Harmon Thomas:
"I asked Mrs. Hendricks [Kline] since she was an employee at the restaurant there, if she was a witness to the accident. And she told me that she was not a witness to the accident, that she did not see what happened_”
After reviewing the transcript, we conclude that the trial court properly excluded this testimony of Ms. Thomas because a proper foundation was not laid for the introduction of this statement. Jackson v. Watson, 360 So.2d 582 (La.App. 4th Cir.), writ denied, 362 So.2d 1389 (La.1978); Schexnayder v. Zurich Insurance, 257 So.2d 764 (La.App. 1st Cir.1972). Ms. Kline was never given the opportunity to admit or deny making this statement to Ms. Thomas.

. We note that plaintiffs operation of the three-wheel motorcycle while not wearing a safety helmet was in violation of La.R.S. 32:190.

. Although we previously found that the trial court's error in failing to introduce the prior inconsistent statement made by Dora King interdicted the jury's liability determinations, this error did not interdict the jury’s findings regarding damages incurred by plaintiff.. Furthermore, defendant did not assign error to the jury’s award of damages.