597 So.2d 456 (1992)
Donald H. WILLIS
v.
Michael D. LETULLE and Cumis Insurance Company.
No. CA 90 0372.
Court of Appeal of Louisiana, First Circuit.
March 6, 1992.
*458 Victor L. Marcello, Donaldsonville, for plaintiff, Donald H. Willis.
Donald Smith, Baton Rouge, for Allstate Ins. Co.
Richard T. Reed, Baton Rouge, for Michael Letulle.
Louis L. Robein, Jr., Metairie, for Intern. Longshoremen's Ass'n.
Before SHORTESS, LANIER and CRAIN, JJ.

ON REMAND
LANIER, Judge.
This case was previously before us as an appeal by the plaintiff, Donald H. Willis. Willis v. Letulle, 581 So.2d 1048 (La.App. 1st Cir.1991). We ruled the trial court erred by (1) allowing cross-examination of Willis about the details of his prior conviction for conspiracy to unload 15,872 tons of marijuana, and (2) granting a directed verdict in favor of the International Longshoreman's Association Local 3033, AFL-CIO (Union). We determined that the evidence was conflicting, the weight of the evidence was nearly equal, and a firsthand view of the witnesses was essential to a fair resolution of the evidence. We remanded the case to the trial court for a new trial pursuant to the authority of Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707 (La.1980). Willis, the Union, Letulle and his liability insurer, Cumis Insurance Company (Cumis) applied to the Louisiana Supreme Court for supervisory relief. The Louisiana Supreme Court peremptorily granted supervisory writs that stated the following:
Granted. Judgment of the court of appeal is vacated. Case is remanded to the court of appeal with instruction to decide the case. There is no legal basis for remand to the trial court for new trial.
Willis v. Letulle, 583 So.2d 484, 485 (La. 1991).
After this appeal was returned to this court, Willis entered into a compromise agreement with Letulle and Cumis. Willis was paid the Cumis policy limits of $30,000, *459 legal interest of $13,000, and $1,750 in court costs. On joint motion of all parties, Letulle and Cumis were dismissed as defendants-appellees with prejudice. The joint motion provided that Willis' uninsured motorist (UM) insurer, Allstate Insurance Company (Allstate) and the Union were "entitled to a credit or set-off for the [Cumis] policy limit of $30,000.00 ... against any judgment which may be rendered in favor of the plaintiff...." In an attached release, Willis reserved "all ... rights against all parties not specifically released herein...."

MEANING OF THE LOUISIANA SUPREME COURT ORDER
On remand, the Union asserts the Louisiana Supreme Court's orders remanding the case require this court to affirm the trial court's directed verdict in favor of the Union. The Union states that in its writ application it asked the Louisiana Supreme Court to reinstate the judgment of the district court granting a directed verdict in its favor. The Union concludes that "The supreme court granted the Union's application by ordering the court of appeal to decide the case, which on the issue of the Union's liability, in the absence of a new trial, can only be decided in favor of the Union."
In response to this, Willis asserts the following:
According to its brief, Allstate [sic] apparently believes that the Supreme Court intended to reverse this court's judgment overturning the jury finding of no liability. However, even a cursory examination of the record would reveal that the Supreme Court could not have intended such a result, for if the Supreme Court held the view that this court committed error in finding the marijuana evidence to have interdicted the verdict, it would have either granted a writ and heard the case, or granted a summary writ and reinstated the original trial court verdict. Fortunately, the Supreme Court did neither of these. Rather, it granted plaintiff's writ and ordered this court to "decide the case." Conclusive proof that the Supreme Court was accepting only the plaintiff's arguments that this court should decide the case rather than remand, the Supreme Court added: "There is no legal basis for remand to the trial court for new trial."
Appellate courts are authorized by La. C.C.P. arts. 2082 and 2164 to order remands in civil cases. Article 2082 defines an appeal as "the right of a party to have a judgment of a trial court revised, modified, set aside, or reversed by an appellate court." Official Revision Comment (d) for Article 2082 provides as follows:
It should be noted that this article includes the idea of the remand. It was thought unnecessary, therefore, to spell out the word itself in the article. Note, also, that the idea of remand is covered by Art. 2164, infra.

Article 2164 authorizes an appellate court to "render any judgment which is just, legal, and proper upon the record on appeal." Official Revision Comments (c) and (d) for Article 2164 provide as follows:
(c) The above text is broad enough to permit affirmance in full and all revisions and modifications, as well as reversals or remandings. Hence, Arts. 905 and 906 of the 1870 Code, which specifically recognize those matters, seem unnecessary.
(d) Art. 902, Code of Practice of 1870, provides that in reversing a judgment the supreme court is to pronounce judgment on the case if it is able to do so, otherwise the case is to be reversed and remanded in accordance with Art. 906. Since Art. 2082, supra, is broad enough to cover the idea of remand, this procedure is adequately covered by this Code.
In Ragas v. Argonaut Southwest Insurance Co., 388 So.2d at 708 appears the following:
Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.

*460 This is not to say, and Gonzales [v. Xerox Corporation, 320 So.2d 163] [(La. 1975)] should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a firsthand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial. (Emphasis added)
As an intermediate appellate court we are obligated to follow these instructions from the Louisiana Supreme Court. Pelican State Associates, Inc. v. Winder, 253 La. 697, 219 So.2d 500 (1969); United States Fidelity and Guaranty Company v. Green, 252 La. 227, 210 So.2d 328 (1968); Lucky v. Fricks, 511 So.2d 1315 (La.App. 2d Cir.), writ denied, 514 So.2d 455 (La. 1987); Phillips v. Nereaux, 357 So.2d 813 (La.App. 1st Cir.1978). The Ragas instruction concerning a remand for a new trial would seem to be most pertinent in jury trial cases. In Parker v. Rowan Companies, Inc., 591 So.2d 349, 352 (La.1991), the Louisiana Supreme Court observed that "... the right to a trial by jury is fundamental in character and courts should indulge in every presumption against waiver, loss, or forfeiture of that right." See also Champagne v. American Southern Insurance Company, 295 So.2d 437 (La.1974). If a trial court error requires an appellate court to decide the facts of a case de novo, that trial court error also has the practical effect of depriving the litigants of their fundamental right to a trial by jury. In the instant case, Willis, Letulle, Cumis and Allstate have requested trial by jury. (Because the trial court granted a directed verdict, Willis' claim against the Union has never gone to a jury.) When the criteria set forth in Ragas have been found to exist, intermediate appellate courts in Louisiana have followed Ragas and ordered remands for new trials. See, for example, Savin v. Allstate Insurance Company, 579 So.2d 453 (La.App. 1st Cir.1991); Moore v. Clark, 517 So.2d 293 (La.App. 1st Cir.1987); Lewis v. State Farm Mutual Automobile Insurance, 499 So.2d 656 (La. App. 3rd Cir.1986); Arledge v. Bell, 463 So.2d 856 (La.App. 2d Cir.1985). Our research indicates that Ragas has never been expressly overruled.
The Louisiana Supreme Court remand order states that "There is no legal basis for remand to the trial court for new trial." The Union argues that the order means that the Louisiana Supreme Court reversed our ruling on its motion for a directed verdict (and by implication that the Louisiana Supreme Court also reversed our ruling on the cross-examination of Willis about the details of his prior conspiracy conviction). Willis disputes this interpretation and contends the order only requires this court to decide the case. Willis' interpretation will prevail if (1) the Louisiana Supreme Court has overruled Ragas by implication, or (2) Ragas is still good law and the Louisiana Supreme Court has determined that (a) the evidence was not conflicting, (b) the weight of the evidence was not nearly equal, or (c) a firsthand view of the witnesses was not essential to a fair resolution of the evidence, or found some combination of (a), (b) and (c).
We do not agree with the Union's interpretation of the order. The Louisiana Supreme Court vacated our judgment; it did not reverse our judgment. This action is similar to the case of Directional Wireline Services, Inc. v. Tillett, 540 So.2d 1103 (La.App. 1st Cir.1989) wherein this court overruled a peremptory exception raising the objection of no right of action, affirmed a trial court grant of a partial JNOV, and reversed the denial of a motion for a new trial and remanded for a new trial. The Louisiana Supreme Court peremptorily granted a writ, vacated our judgment and ordered us to decide the case on the record. Tillett, 541 So.2d 1386 (La.1989). On remand, we reconsidered and confirmed our prior rulings on the peremptory exception and the partial JNOV and decided the case. Directional Wireline Services, Inc. v. Tillett, *461 552 So.2d 1201 (La.App. 1st Cir.), writs denied, 551 So.2d 1343, 1344 (La.1989).
We do not believe the Louisiana Supreme Court reviewed the factual determinations of whether the evidence was conflicting, whether the weight of the evidence was equal or whether a firsthand view of the witnesses was essential to a fair resolution of the evidence. Further, those criteria are met in this case. The writ herein was granted peremptorily; the Louisiana Supreme Court did not order us to send up the record. Our records show that the appeal record never left this court since we originally decided this case. In this posture, we do not believe that the Louisiana Supreme Court decided these factual matters without reviewing the appeal record.
Accordingly, we must conclude the writ action by the Louisiana Supreme Court herein has overruled Ragas by implication. This conclusion is fortified by the writ action taken by the Louisiana Supreme Court in Landry v. Doe, 582 So.2d 242 (La.App. 1st Cir.), writs granted, 586 So.2d 543 (La. 1991). In Landry, the trial court erred by excluding the prior inconsistent statement of a fact witness. This court held that the error was prejudicial and interdicted the jury verdict. The Ragas criteria were present in Landry. This court followed Ragas and remanded for a new jury trial. The Louisiana Supreme Court peremptorily granted a writ and ordered this court to decide the case on the merits.

RECONSIDERATION OF VACATED RULINGS

(Assignments of error 2 and 3)
We have reconsidered our prior rulings on (1) the cross-examination of Willis about the details of his prior conspiracy conviction, and (2) the granting of the Union's motion for directed verdict, and, for the reasons given in our prior opinion, we reinstate those rulings. The trial court errors on these issues have interdicted the factual findings of the jury and the trial judge. Accordingly, the manifest error (clearly wrong) standard of appellate review is not applicable, and we will make our own independent (de novo) review of the record and determine a preponderance of the evidence.[1]McLean v. Hunter, 495 So.2d 1298 (La.1986).

ASSIGNMENT OF ERROR 8
Willis' assignment of error 8 states the following:
8. The trial court committed manifest error in excluding evidence that in the days previous to the accident at issue, there were numerous telephone calls to Willis' home involving threats against Willis himself and threats against his wife and child which involved the raping of his wife and the performance of unnatural sex acts with his child, and that men were riding up and down in front of his house prior to the accident displaying shotguns; the court further committed manifest error in failing to allow the testimony of Lawrence Ledet, who testified in proffer that Leroy Hymel, the union business agent, indicated to him (Lawrence) on the day before the accident that the union men were going to kill Donald Willis; and lastly the trial court committed manifest error in ruling that Donald Willis could not testify that Ledet provided him with the aforesaid information.
Willis' brief for this assignment of error states the following:
The argument on this specification of error is included within the Argument on Specification of Error Number 3.
A review of the brief (argument) for assignment of error 3 shows that it pertains solely to the issue of the cross-examination of Willis about the details of his prior conviction for conspiracy; there is nothing in this portion of the brief pertaining to assignment of error 8.
Uniform Rule 2-12.4 of the Uniform Rules, Court of Appeal provides, in pertinent part, as follows:

*462 The argument on a specification or assignment of error in a brief shall include a suitable reference by volume and page to the place in the record which contains the basis for the alleged error. The court may disregard the argument on that error in the event suitable reference to the record is not made.
All specifications or assignments of error must be briefed. The court may consider as abandoned any specification or assignment of error which has not been briefed.
Because counsel for Willis has failed to comply with these rules, this assignment of error is considered abandoned and is disregarded.

EVIDENCE OF PRIOR THREATS AND STATE OF MIND

(Assignments of error 6 and 7)
In assignment of error 6, Willis asserts the "trial court committed manifest error in failing to allow Willis to testify about threats to himself and his family previous to the date of the accident and to testify as to why he was angry upon being hit in the face with paint by LeTulle [sic]." In assignment of error 7, Willis asserts the "trial court committed manifest error in ruling that LeTulle [sic] could testify that Willis threatened to kill him and in denying Willis the right to offer collateral evidence of pre-accident threats by LeTulle [sic] against Willis."
In response to these assignments of error, counsel for Allstate asserts the following in his appellate brief:
A fair reading of the trial transcript must lead to the conclusion that both Willis and Letulle were given an adequate opportunity to describe the general threats that took place on the picket line and for each of them to explain his general frame of mind on the date of the accident. Plaintiff attempted to introduce some extremely inflammatory threats which were made by anonomous [sic] telephone callers. Because of the inherent unreliability of this testimony and its obvious hearsay character, the plaintiff was prevented from testifying as to what was told him on the telephone. The court conducted a hearing on the proffered testimony outside the presence of the jury (Tr. 208-223), and appellee suggests that the court acted completely properly [sic] in excluding the proposed testimony. Nevertheless, the plaintiff had a fair opportunity to explain to the jury that he was greatly upset over the threats he had received while crossing the picket line and by the conduct of Michael Letulle in throwing the paint on the morning of the accident.
Appellant contends that the proffered testimony was necessary to "explain his state of mind when he decided to engage in the chase". Assuming that anonomous [sic] threats had been made against Willis and his family, then it does not necessarily follow that the threats were related to the paint throwing incident. It is more logical to conclude that Willis instituted the chase out of his anger over being struck with the paint. Evidence of these anonomous [sic] threats would have been highly prejudicial to Michael Letulle and of very little probative value to the plaintiff. This evidence was properly excluded under L.C.E. 403.
. . . . .
Eight days before trial began, a hearing was held before the trial judge on the plaintiff's motion to add Laurence [sic] Ledet and Paul Allen Yerger [sic] as additional witnesses. It was agreed between counsel at the hearing that opposition to the testimony of these witnesses would be withdrawn as long as the witnesses limited their testimony to evidence of liability of the International Longshoremens Union. The witnesses were subsequently deposed shortly before trial, and the depositions were attended solely by counsel for plaintiff and counsel for the International Longshoremens Union. During the course of those depositions, one or more of the witnesses claimed to have overheard a threat by Letulle against Willis. At trial, the defendants objected to this testimony on the grounds that it violated the agreement which permitted the witnesses to *463 testify. (Tr. 86-102). After a hearing on these evidentiary issues before trial commenced, the judge ruled that the plaintiff could not introduce testimony of Yerger [sic] and Ledet relative to any threats they may have heard Letulle make or, alternatively, the trial would be continued to give all parties an opportunity to redepose those witnesses and engage in additional discovery. Plaintiff's counsel was asked to choose between the court's order striking the testimony and a continuance. Counsel chose to proceed with the trial and, in doing so, he has waived any right to raise this issue on appeal.
In response to these assignments of error, counsel for Letulle and Cumis asserts the following in his appellate brief:
The specific testimony that appellant complains was excluded had marginal probative value and was highly prejudicial and inflammatory with regard to appellee, LeTulle [sic]. It was based on anonymous telephone calls and deposition testimony elicited in contravention of a pretrial order agreement among the parties. The trial court properly excluded this testimony and its action in doing so was not prejudicial to the appellant who was given ample opportunity to explain to the jury why he decided to pursue the LeTulle [sic] vehicle in the manner that he did.
. . . . .
The threats that Willis directed to LeTulle [sic] during the chase are a significant part of the res gestae of this incident. Mr. Willis was available at trial to admit or deny the threats, thus there was no evidentiary problem with the evidence of threats made by Willis. However, Willis complains that it was unfair not to allow evidence of threats that LeTulle [sic] supposedly made against Willis. The problem here is that the particular evidence, namely testimony of Mr. Charles Yerger [sic] was elicited during a deposition in which all counsel understood Mr. Yerger [sic] was to testify only relative to union liability and not pertaining to any liability of Mr. LeTulle [sic] individually. Counsel for Mr. LeTulle [sic] objected to this testimony because he was not present and Willis was given the choice to proceed without the evidence or have a continuance to allow defendant an opportunity to conduct adequate discovery. Mr. Willis' counsel chose to proceed. Additionally, the proffer of Mr. Yerger [sic] clearly indicates that he could in fact not testify as to any threats actually made by Mr. LeTulle [sic].
Again, the probative value of this evidence is marginal at best and by no means responsible for any alleged "false impression" of the evidence by the jury or the ultimate verdict reached. This specification of error is without merit.
In response to assignment of error 8, counsel for the Union asserts the following in his appellate brief:
Appellant strenuously argues that the trial judge and opposing counsel confused the proffered testimony of Charles Yerger [sic] and Lawrence "Zeus" Ledet. Admittedly, the record is somewhat unclear as to the basis of the trial judge's refusal to allow in certain testimony of Ledet. However, his actions are explainable and supported by the record as a whole.
The testimony of Yerger [sic] was rejected because the attorneys of record for Cumis Insurance and Allstate Insurance were not noticed of the deposition of union official Leroy Himel. At the outset of the trial, when those attorneys became aware of the intent of the appellant to offer certain testimony from Yerger [sic], they strenuously protested, since Yerger's [sic] involvement was discussed and developed through the deposition testimony of Himel. At that juncture in the trial, the trial judge offered the appellant the opportunity to continue the trial. As appellant now admits, he declined the invitation to continue the trial since his counsel had devoted considerable economic resources to trial preparation.
When certain testimony of Ledet was being considered by the trial judge, in relation to standing objections from *464 counsel for the appellees, his testimony was likewise rejected, since the basis of his testimony had been developed through the deposition of Himel. Appellant himself would concede to this. He argues in brief that he should have been able to impeach Himel with the testimony of Ledet. The only testimony to impeach was the testimony developed through the same deposition of Himel, which formed the basis for excluding Yerger's [sic] testimony.
Pursuant to La.C.C.P. art. 2164, an appellate court must render its judgment upon the record on appeal. The record on appeal is that which is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcript, jury instructions, judgments and other rulings, unless otherwise designated. La.C.C.P. arts. 2127 and 2128; Official Revision Comment (d) for La.C.C.P. art. 2127. An appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence. Davis v. Anderson, 451 So.2d 1302 (La.App. 1st Cir. 1984). In State ex rel. Guste v. Thompson, 532 So.2d 524, 527, n. 2 (La.App. 1st Cir.1988) appears the following:
The briefs of the parties assert facts which are not in the record and refer to exhibits which have not been filed in evidence in the record. An appellate court may not consider evidence which is outside the record. La.C.C.P. art. 2164. The briefs of the parties and the attachments thereto are not part of the record on appeal. Bunch v. Town of St. Francisville, 446 So.2d 1357 (La.App. 1st Cir. 1984). In addition, we may not consider exhibits filed in the record which were not filed in evidence, unless authorized by law to do so. See, for example, La. C.C.P. arts. 966 and 967.
See also Leyva v. Laga, 549 So.2d 914 (La.App. 3rd Cir.1989). The appellate briefs of the parties are not part of the record on appeal, and this court has no authority to consider on appeal facts referred to in appellate briefs if those facts are not in the record on appeal. Tranum v. Hebert, 581 So.2d 1023 (La.App. 1st Cir.), writ denied, 584 So.2d 1169 (La.1991).
The appellate record herein shows the following facts. The jury trial herein was scheduled for June 29, 1989. On June 12, 1989, counsel for Letulle and Cumis filed a motion to strike which provided as follows:
1.
On or about May 31, 1989, plaintiff sought to amend the pre-trial list of exhibits and witnesses substantially naming at least fifteen (15) additional witnesses one of whom is an economist.
2.
The trial is scheduled for June 29, 1989.
3.
Defendants submit in light of the fact that Interrogatories and Request for Production of W-2 forms were propounded upon plaintiff on July 13, 1987 and have not been answered even to date, that the amending of the pre-trial order which list [sic] numerous witnesses and exhibits is prejudicial to all defendants and accordingly should be stricken and disallowed.
This motion was fixed for a hearing on June 21, 1989. As previously indicated, Allstate's appellate brief states that "Eight days before trial began, a hearing was held before the trial judge on the plaintiff's motion to add Lawrence Ledet and Paul Allen Yeager as additional witnesses." Further, as hereinafter indicated, the motion to strike or alternatively for a continuance filed by Letulle and Cumis on June 29, 1989, states "That on June 21, 1989, a hearing was held on a Motion to Strike concerning the list of additional witnesses and exhibits by the plaintiff." However, the minute entry for June 21, 1989, shows that the matter was continued without date. Willis' pre-trial list of witnesses and exhibits and his attempted amendment thereto are not in the record before us. The record does not have a transcript or narrative of facts to show what happened on June 21, 1989.
*465 The minute entry for June 29, 1989, shows that prior to the roll call of prospective jurors, counsel for Letulle and Cumis filed a motion "in limine" and a motion to strike or alternatively for continuance with the trial court. The motion "in limine" provided as follows:
The testimony by all witnesses concerning prior acts, occurrences and statements be specifically excluded from evidence due to the fact that they do not have any relevance to the issue before the Court involving the allegations of Donald Willis against Cumis Insurance Society, Inc. and Michael D. Letulle.
The motion to strike or alternatively for continuance provided as follows:
1.
That on June 21, 1989, a hearing was held on a Motion to Strike concerning the list of additional witnesses and exhibits by the plaintiff.
2.
An agreement was reached with counsel for plaintiff and that before the Court it was stated that only two witnesses would be called namely, Laurence [sic] Ledet and Paul Allen Yerger [sic].
3.
That counsel for plaintiff advised undersigned counsel that both of these witnesses would be called to testify against the Union and their testimony was not as to Michael D. Letulle.
4.
Based upon these assertions, counsel for Michael Letulle and Cumis Insurance Society, Inc. agreed to allow those two witnesses to be called.
5.
Counsel for Michael D. Letulle and Cumis Insurance Society, Inc. received a copy of the depositions of Paul Allen Yerger [sic] and Laurence [sic] Ledet which were taken by counsel for defendant, Union on Monday, June 26, 1989.
6.
Due to the fact that counsel for Michael D. Letulle and Cumis Insurance Society, Inc. had a trial on June 27, 1989, before the Honorable Judge Moreau in East Baton Rouge Parish which was scheduled to last all day and which in fact did last until 6:30 p.m. on June 27, 1989, counsel for said defendants was in the process of preparing and did not attend the depositions. Furthermore, counsel for said defendants had no reason to attend the depositions due to the fact that it was his appreciation that neither of these witnesses were going to testify detrimentally to Michael D. Letulle but only as to the Union.
The court minutes for June 29, 1989, show the following dispositions of these motions:
Out of the presence of the prospective jurors attorney for Cumis Insurance Society, Inc. filed motion in limine and motion to strike or alternatively for continuance and attorney's [sic] for International Longshoreman's Association, Local 3033, AFL-CIO and attorney for Cumis Insurance Co. filed joint motion in limine. Both matters argued and motion in limine and motion to strike granted by the Court.
The court minutes do not reflect that Willis objected to the rulings of the trial court. The record before us does not contain a transcript or a narrative of facts showing what was done in the trial court on these motions. After the trial court ruled on the motions of Letulle and Cumis, jury selection commenced and continued until the jury was selected and sworn in. The transcript in the record begins with preliminary instructions to the jury. Thereafter, the non-party witnesses were sworn and sequestered. The trial court then recessed from 1:10 p.m. until 2:15 p.m.
The court minutes show that the trial court reconvened at 2:15 p.m. In the presence of the jury, counsel for Willis objected to certain procedures used in the selection of the jury. The trial judge retired the jury. After some discussion, counsel for Willis withdrew his objections. Thereafter, counsel for Willis asked the trial judge for *466 some guidelines about what could, and could not, be said in opening statements to the jury in view of the court's evidentiary rulings earlier in the proceedings. After some discussion, the following occurred:
MR. MARCELLO: WELL, IT MIGHT BE CRITICAL BUT WHAT I WANT TO KNOWALL I WANT IS A RULING FROM THE COURT SO I DON'T GET IN ANY TROUBLE. ALL I WANT TO KNOW IS, AM I GOING TO BE ALLOWED TO PRODUCE EVIDENCE ASK MR. LETULLE, WHEN HE GETS ON THE STAND"MR. LETULLE, DID YOU, THE DAY BEFORE THIS HAPPENED, MAKE A STATEMENT THAT YOU WERE GOING TO KILL MR. WILLIS?" NOW, THAT'S NOT HEARSAY.
THE COURT: I WOULD THINK, IN THE NORMAL COURSEI'M GETTING THE CART BEFORE THE HORSEI WOULD THINK, IN THE NORMAL COURSE OF EVENTS, ON CROSS-EXAMINATION YOU COULD ASK HIM THAT. BUT I DON'TI HAVEN'T HEARD ANY RESPONSE FROM COUNSEL ON THIS BECAUSE THIS IS THE FIRST TIME THIS HAS BEEN RAISED IN THIS MANNER. INSOFAR AS WHAT YOUR MAN SAID OR WHAT HE WOULD SAY, IN RESPONSE TO YOUR QUESTION.
MR. ROBEIN: THIS CAME UP AS A RESULT OF MR. REED'S MOTION TO CONTINUE THE TRIAL OR STRIKE THE TESTIMONY, AND VIC TOOK HIS MEDICINE AT THAT TIME. HE SAID HE'D GO FORWARD AND TAKE HIS CHANCES ON APPEAL. THAT TESTIMONY HAS BEEN STRIKEN [sic] BECAUSE MR. REED, IN FACT, WAS NOT INVITED TO THAT DEPOSITION WHERE, FOR THE FIRST TIME IN THIS CASE, IT WAS REVEALED BY MR. YERGER [sic] THAT MR. LETULLE SAID THESE TERRIBLE WORDS. NOW, THEY SAID THAT AT OUR DEPOSITION WHEN WE WERE THERE TO DETERMINE IF THERE WAS ANY UNION LIABILITY. NOW WE GET BACK TO THE ORIGINAL RULING. THAT TESTIMONY WAS STRIKEN [sic]. HE WAS GIVEN THE CHOICE, CONTINUE THE TRIAL OR STRIKE THE TESTIMONY. EVERYONE HAS KNOWN FROM DAY ONE THAT MR. WILLIS' CANDID ADMISSIONSNOT THAT HE SAID IT BUT THAT HE INTENDED TO BEAT HIS BRAINS OUT. NOT THAT HE SAID IT, BUT THAT HE INTENDED TO DO SO. AND I THINK HE IS GOING TO TESTIFY THAT THAT WAS IN HIS MIND THAT DAY WHEN HE WAS CHASING THE BOY DOWN THE ROAD. BUT WE GET BACK TO THE PROBLEM OF THIS DEPOSITION THAT OCCURRED ON MONDAY OF THIS WEEK. MR. YERGER [sic], MR. WILLIS' FRIEND, FOR THE FIRST TIME, SAID THAT LETULLE WAS IN SUCH-AND-SUCH ESTABLISHMENTOR MR. LEDET WAS IN SUCH-AND-SUCH ESTABLISHMENT AND HE SAID, "I'M GOING TO KILL WILLIS." THAT'S PARAPHRASING, BUT WE GET BACK TO YOUR RULING. YOU SAID THAT CAN'T COME IN, NOT BECAUSE OF FAIRNESS, NOT BECAUSE OF HEARSAY, BUT BECAUSE OF THE PRETRIAL ORDER AND THE STRUCTURING OF THE PRETRIAL AND THE AGREEMENT AMONGST COUNSEL.
MR. MARCELLO: AND MY POSITION, AS IT WAS THIS MORNING, YOUR HONOR, WAS THAT WE WERE NOT GOING TO CALL MR. YERGER [sic] IN OUR CASE IN CHIEF; HOWEVER, WE DO BELIEVE THAT MR. REED WILL ACKNOWLEDGE THAT HE WAS INVITED TO THE DEPOSITION.
MR. REED: LET ME JUST CLARIFY THAT. I KNEW THERE WAS GOING TO BE A DEPOSITION BUT I'VE ALREADY SAID THAT I DIDN'T GO BECAUSE OF WHAT MY UNDERSTANDING WAS OF
THE COURT: WE HAVE THRASHED THAT OUT, AND I HAVE SAID THAT I THOUGHT THAT YOU WERE SATISFIED WHEN YOU LEFT HERE THE MORNING OF THE RULING, THAT THE AGREEMENT WAS SUCH THAT *467 YOUR APPEARANCE AT THE DEPOSITION WAS NEITHER NECESSARY NOR IN ANY WAY RELEVANT TO YOUR REPRESENTING YOUR CLIENT.
MR. REED: THAT'S CORRECT, YOUR HONOR.
THE COURT:AND THAT, THEREFORE, IT WOULD BE UNFAIR FOR YOU TO BE HELD TO NOTICE ANYTHING THAT TOOK PLACE AT THE DEPOSITION, AND THAT I WOULD EXCLUDE THAT TESTIMONY. I SAID THAT IN THERE THIS MORNING, AND I'M CONSTRAINED TO BE CONSISTENT AND TO KEEP ON SAYING IT THIS AFTERNOON.
MR. MARCELLO: MY POINT IS, YOUR HONOR, THAT, ALTHOUGH FOR THE RECORD, I THINK I SHOULD BE ABLE TO CALL MR. YERGER [sic]. IF YOUR HONOR'S OPINION IS THAT I CAN'T, AND HIS TESTIMONY IN THE CASE IN CHIEF IS GOING TO BE STRIKEN [sic], THEN THAT HAS REALLY NOTHING TO DO WITH THE FACT THAT I PUT MR. LETULLE ON THE STAND WHEN HIS ATTORNEY PUTS HIM ON THE STAND, AND I ASK HIM IF HE THREATENED TO KILL MR. WILLIS, AND HE DENIES IT, I HAVE A RIGHT TO COME BACK ON REBUTTAL AND IMPEACH HIS TESTIMONY.
THE COURT: NO, NO, THAT TRICK WON'T WORK.
MR. MARCELLO: I'M NOT USING IT AS A TRICK.
THE COURT: NO, SIR. THIS BUSINESS OF CALLING SOMEBODY ON REBUTTAL AND NOT LISTING HIM ON THE PRETRIAL AND NOT TAKING HIS DEPOSITION AND SAYING HE'S A REBUTTAL WITNESS, THAT WON'T CUT IT. AND I'M NOT GOING TO ALLOW THAT.
THAT'S JUST AS THOUGH YOU AND I WERE IN AN AUTOMOBILE ACCIDENT, AND SIMPSON HERE (INDICATING THE BAILIFF) IS AN EYEWITNESS. THEN WE GO TO COURT AND I DON'T LIST SIMPSON BECAUSE I KNOW WHAT YOU'RE GOING TO TESTIFY TO. HE DOESN'T APPEAR ON THE PRETRIAL ORDER OR ANYTHING ELSE, AND AFTER YOUR TESTIMONY IS ONE WAY, THEN HERE'S THIS MAN, WHOSE DEPOSITION HAS NEVER BEEN TAKEN, THAT I PRODUCE AS MY REBUTTAL WITNESS WHEN, AS A MATTER OF FACT, HE'S NOTHING MORE THAN MY WITNESS TO BEGIN WITH AND SOMEBODY WHO SHOULD BE LISTED ON THE PRETRIAL ORDER SO THAT HIS DEPOSITION COULD BE TAKEN IF THE OPPOSING COUNSEL WANTED TO DO SO. IT IS EXACTLY THE SAME THING, AND YOU'RE NOT GOING TO DO IT THAT WAY.
MR. MARCELLO: I UNDERSTAND THE COURT'S RULING. ALL I'D LIKE TO SAY IS, I'LL PUT THE DEPOSITION IN EVIDENCE ON A PROFFER. MR. REED WAS INVITED TO THE DEPOSITION, FOR WHATEVER THAT'S WORTH.
HOWEVER, THE COURT THEN SINCE WE HAVE ALREADY DECIDED THAT ISSUEONLY HAS TO RULE NOW ON WHETHER OR NOT I HAVE TO ACKNOWLEDGE, IN MY OPENING STATEMENT, THAT MR. LETULLE IS GOING TO TESTIFY THAT MR. WILLIS WAS THREATENING TO KILL HIM. I NEED TO KNOW IF THE COURT IS GOING TO ALLOW THAT EVIDENCE, THAT MR. WILLIS WAS SHAKING HIS FINGER AT MR. LETULLE SAYING, "I'M GOING TO KILL YOU."
THE COURT: IF IT'S ADMISSIBLE EVIDENCEIF HE WAS IN A POSITION TO KNOW IT AND CAN TESTIFY TO IT, ABSOLUTELY.
MR. MARCELLO: OKAY, THAT'S FINE. LET THE RECORD REFLECT THAT I THINK IT'S GROSSLY UNFAIR TO HAVE TESTIMONY OF MR. LETULLE THAT MR. WILLIS WAS GOING TO KILL HIM, AND NOT HAVE ME BE ABLE TO PROVE THAT *468 MR. LETULLE SAID THE SAME THING.
THE COURT: IF YOU WOULD HAVE HANDLED YOUR BUSINESS RIGHT WITH YOUR PRETRIAL ORDER, YOU WOULDN'T BE IN THAT DILEMMA.
MR. MARCELLO: I THINK THE LAW IS CLEAR THAT I DON'T HAVE TO LIST REBUTTAL WITNESSES.
MR. ROBEIN: JUDGE, MAY I CLARIFY THE RECORD, BECAUSE IT'S OUR DEPOSITION AND I'M INDIRECTLY, IF NOT DIRECTLY, INVOLVED IN IT? THIS IS NOT IN THE RECORD BUT IT SHOULD BE: PLAINTIFF WAS GIVEN A CHOICE SEVERAL HOURS AGO TO FISH OR CUT BAIT, AND HE DECIDED TO FISH.
THE COURT: THAT'S RIGHT, SIR.
MR. ROBEIN: AND HE WAS GIVEN THE OPPORTUNITY TO CONTINUE THIS TRIAL TO ALLOW MR. REED, WHO WAS TOLD LEDET AND YERGER [sic] WOULD BE UNION-LIABILITY-ONLY WITNESSES. INSTEAD, AND TO THE SURPRISE TO EVERYBODYAND I WOULD DARE SAY SURPRISE TO PLAINTIFF'S COUNSELMR. YERGER [sic] AND MR. LEDET TURNED OUT TO GIVE EVIDENCE THAT DIRECTLY IMPLICATED LETULLE AS LETULLE, NOT AS LETULLE, A UNION MEMBER, BUT LETULLE AS LETULLE. AND IT WAS ON THE BASIS OF THAT, THAT YOU MADE THAT RULING. AND I'M ONLY SAYING THAT BECAUSE IT'S NOT IN THE RECORD AND IT NEEDS TO BE IN THE RECORD NOW THAT WE'RE TALKING ABOUT FAIRNESS AND PEOPLE BEING SANDBAGGED AND NOT SANDBAGGED.
THE COURT: THANK YOU, SIR.
MR. REED: AND, YOUR HONOR, I THINK WE SHOULD ALSO PUT IN THE RECORD THAT OTHER COUNSEL FOR DEFENDANTS WERE ALSO UNDER THE SAME IMPRESSION AS TO WHAT THESE WITNESSES WERE GOING TO TESTIFY TO; I.E., THAT THE WITNESSES WERE ONLY AGAINST THE UNION AND NOT AGAINST MR. LETULLE. I THINK THAT BOTH OF YOU HAD THE SAME UNDERSTANDING, WHETHER IT WAS A MISUNDERSTANDING OR NOT; IS THAT CORRECT?
MR. SMITH: THAT'S CORRECT.
THE COURT: THANK YOU.
MR. MARCELLO: THAT'S FINE, WE CAN MAKE OUR PROFFERS LATER.
A careful review of this portion of the transcript shows that the trial judge ultimately just reaffirmed the evidentiary rulings he previously made.
After another preliminary matter, opening statements were commenced. After counsel for Letulle and Cumis finished his opening statement, the following occurred:
MR. MARCELLO: YOUR HONOR, FOR THE RECORD, I DID NOT WANT TO INTERRUPT MR. REED'S OPENING STATEMENT, BUT I WOULD LIKE TO MAKE AN OBJECTION TO HIS COMMENTS ABOUT MR. WILLIS' ALLEGED RAGE AND UNREASONABLENESS, BECAUSE IN LIGHT OF THE COURT'S PRIOR RULINGS, WHICH I WILL NOT FURTHER ELUCIDATE AT THIS TIME, I THINK IT'S UNREASONABLE TO PREVENT ME FROM EXPLAINING MR. WILLIS' RAGE, AND THEN ALLOW MR. REED TO COME IN AND ACCUSE HIM OF BEING IN A RAGE.
THE COURT: RETIRE THE JURY, PLEASE.
(JURY RETIRED AT THIS TIME.)
THE COURT: I DON'T KNOW WHAT GOOD IT DOES, MR. MARCELLO, FOR ME TO MAKE A RULING AND THEN YOU TO PERSIST AS THOUGH THE RULING HAD NOT BEEN MADE, OR TO TRY TO GET TO THE JURY, THE VERY THING THE COURT SAID, BY VIRTUE OF THE RULING, THAT YOU COULDN'T DO.
MR. MARCELLO: I PURPOSELY DID NOT MENTION IT BECAUSE I DIDN'T WANT TO POISON THE JURY.
THE COURT: WHAT DO YOU THINK YOU JUST DID? WHAT DID YOU *469 JUST SAY IN FRONT OF THE JURY? YOU SAID THAT I'M LETTING HIM DO SOMETHING AND I'M NOT LETTING YOU DO THIS AND NOT LETTING YOU DO THAT. YOU COULD HAVE MADE YOUR OBJECTION OUT OF THE PRESENCE OF THE JURY.
MR. MARCELLO: ALL RIGHT, EVERYTIME I MAKE ONE NOW, I'LL REQUEST THAT THE JURY LEAVE.
MR. ROBEIN: JUST APPROACH THE BENCH.
MR. MARCELLO: I PURPOSELY DID NOT SAY ANYTHING ABOUT THE PRIOR RULING OF THE COURT. ALL I OBJECTED TO WAS THE FACT THAT I WAS NOT ALLOWED TO EXPLAIN MR. WILLIS' RAGE.
MR. ROBEIN: COULD WE HAVE AN INSTRUCTION TO THE JURY, YOUR HONOR?
THE COURT: I DON'T KNOW WHAT TO TELL THEM. BUT I CAN TELL YOU I'M NOT GOING TO PUT UP WITH THIS ANYMORE, MR. MARCELLO. I THOUGHT WE UNDERSTOOD EACH OTHER ONCE IN THERE; I THOUGHT WE UNDERSTOOD EACH OTHER TWICE IN THERE; I THOUGHT WE UNDERSTOOD EACH OTHER ANOTHER TIME OUT HERE, AND YET ANOTHER TIME. THIS IS THE FIFTH TIME THAT I'VE HAD PROBLEMS WITH YOU. IS IT THAT YOU DON'T UNDERSTAND, OR WHAT IS IT?
MR. MARCELLO: I DIDN'T MAKE IT AN ISSUE. I NEVER MENTIONED IT.
THE COURT: IT DOESN'T MATTER WHO MADE IT AN ISSUE. YOU BROUGHT IT UP BEFORE THE JURY.
MR. MARCELLO: HE MADE IT AN ISSUE.
THE COURT: YOU BROUGHT IT UP BEFORE THE JURY.
MR. MARCELLO: HE MADE IT AN ISSUE.
THE COURT: IT DOES NOT MATTER. YOU WERE TOLD NOT TO DO IT. THE RULING WAS MADE, AND YOU TURNED RIGHT AROUND AND DID IT IN FRONT OF THE JURY.
MR. MARCELLO: DID WHAT?
THE COURT: I'M TELLING YOU WHAT YOU DID, AND YOU'RE NOT GOING TO DO IT AGAIN.
MR. MARCELLO: THAT'S FINE. THEN I CAN'T DEFEND MR. WILLIS
THE COURT: IF YOU DON'T KNOW BY NOW WHAT YOU CAN'T DO, IT'S TOUGH.
BRING THE JURY BACK IN.
MR. MARCELLO: WELL, YOUR HONOR, I'VE GOT TO PROTECT MY CLIENT AND MAKE OBJECTIONS FOR THE RECORD, AND I'M GOING TO DO THAT THROUGHOUT THE WHOLE CASE. IF YOU WANT THE JURY RETIRED, THEN WE'LL JUST BOUNCE THEM BACK AND FORTH. I HAVE A RIGHT TO DO IT AND I'M GOING TO DO IT.
THE COURT: YOU LISTEN TO ME. YOU'RE NOT GOING TO DO THAT AGAIN OR YOU'LL BE HELD IN CONTEMPT OF COURT. BECAUSE I'M TELLING YOU HERE AND NOW, I WANT YOU TO UNDERSTAND IT WELLI DON'T KNOW HOW TO EXPLAIN IT ANY BETTERTHAT I HAVE RULED ON WHAT YOU CAN SAY AND CAN'T SAY. AND AS FAR AS I'M CONCERNED, YOUR OPENING ARGUMENT WAS IN CONFORMITY WITH THE RULING AND WITH WHAT I THOUGHT WAS THE UNDERSTANDING. AND I MADE IT CLEAR TO YOU THAT I DIDN'T WANT TO DO THE VERY THING THAT WE'RE DOING, AND THAT WAS THE WHOLE PURPOSE OF TRYING TO GET ALL OF THIS STRAIGHT, TO BEGIN WITH. IF YOU HAVE ANY OBJECTION, I'M NOT SAYING THAT YOU CAN'T MAKE IT, BUT YOU'RE GOING TO MAKE IT AT THE PROPER TIME AND YOU'RE NOT GOING TO GET UP HERE AND SAY IN FRONT OF THE JURY THE VERY THINGS THAT I SAID YOU COULDN'T SAY AND DISOBEY THE RULING OF THE COURT. IF YOU DO *470 THAT, YOU'RE GOING TO BE HELD IN CONTEMPT. IF YOU HAVE ANY QUESTIONS ABOUT WHAT YOU CAN AND CAN'T DO, I SUGGEST THAT YOU ASK THEM NOW. BECAUSE I DON'T KNOW HOW TO EXPLAIN IT TO YOU ANY BETTER, MR. MARCELLO.
MR. MARCELLO: WELL, WHAT I INTEND TO DO, YOUR HONORAND I THINK YOU'RE CLEARIF I'VE GOT TO MAKE AN OBJECTION, I'M GOING TO GET UP AND ASK THAT THE JURY BE RETIRED.
MR. ROBEIN: JUST APPROACH THE BENCH.
MR. MARCELLO: OR WE CAN APPROACH THE BENCH, EITHER WAY.
THE COURT: DO YOU HAVE ANY GENERAL QUESTIONS ABOUT WHAT YOU CAN DO AND CAN'T DO NOW, AND WHAT AREAS YOU CAN GO INTO.
MR. MARCELLO: IT'S STILL NOT CLEAR TO ME, YOUR HONOR, BUT I WON'T BREACH THE COURT'S RULING. I'LL JUST DO WHAT WE HAVE TO DO. AS I UNDERSTAND THE COURT'S RULINGCORRECT ME IF I'M WRONGI CANNOT ELICIT FROM MY OWN CLIENT, HIS EXPLANATION OF WHY HE WAS IN A RAGE. IF THAT'S THE COURT'S RULING, THAT'S FINE. BUT I DON'T THINK IT'S FAIR FOR MR. REED TO GET UP AND ARGUE THAT MY CLIENT WAS IN A RAGE, AND NOT LET ME HAVE MY OWN CLIENT EXPLAIN WHY HE WAS IN A RAGE.
MR. ROBEIN: HE ALREADY RULED ON THAT. HE EXPLAINED WHY
MR. MARCELLO: IF HE ALREADY RULED ON IT, THAT'S FINE. JUST NOTE IT FOR THE RECORD. I'VE GOT TO PRESERVE THE RECORD, THAT'S ALL I'M TRYING TO DO.
THE COURT: YOUR FEELINGS AND YOUR OBJECTION ARE IN THE RECORD. DO YOU WANT TO DO ANYTHING MORE ABOUT THAT NOW?
MR. MARCELLO: NO.
THE COURT: DO YOU FORESEE THAT YOU'RE GOING TO HAVE TO SAY IT AGAIN?
MR. MARCELLO: WE MAY. I DON'T KNOW WHAT THE TESTIMONY IS GOING TO BE. I DON'T KNOW WHAT IS GOING TO DEVELOP. IF IT DOES COME UP WE'LL APPROACH THE BENCH. I WON'T TALK IN FRONT OF THE JURY.
A careful review of this portion of the transcript shows that counsel for Willis entered an untimely objection to a portion of the opening statement of counsel for Letulle and Cumis. During his argument on this objection, counsel for Willis reurged his complaints about the trial judge's initial evidentiary rulings. After this counsel for the Union gave his opening statement.
After opening statements were concluded, Willis began presenting his case-in-chief. During Willis' testimony the following occurred:
MR. MARCELLO: AT THIS POINT, YOUR HONOR, I'D LIKE TO APPROACH THE BENCH.
THE COURT: THIS ISN'T GOING TO WORK. RETIRE THE JURY.
(JURY LEAVES THE ROOM AT THIS TIME)
MR. MARCELLO: AT THIS POINT IN MY DIRECT EXAMINATION, YOUR HONOR, I'D LIKE TO STATE, FOR THE RECORD, IT WAS MY INTENTION TO ELICIT FROM MR. WILLIS, TESTIMONY THAT WILL STATE, IN EFFECT, THAT DURING THE DAYS PRECEDING THE ACCIDENT THERE WERE NUMEROUS CALLS TO HIS HOUSE, AND THOSE CALLS INVOLVED THREATS TO HIS PERSON, TO HIS CHILD. THE THREATS AGAINST HIS WIFE AND HIS CHILD WERE TO RAPE HIS WIFE AND PERFORM UNNATURAL SEX ACTS WITH HIS DAUGHTER. THE PURPOSE OF THE TESTIMONY IS TO SHOW WHAT WAS HIS STATE OF MIND AT THE TIME HE TURNED AROUND TO CHASE MR. LETULLE. THAT'S THE *471 TESTIMONY I INTEND TO ELICIT HERE.
. . . . .
THE COURT: WAIT, WAIT. LET'S TAKE FIRST THINGS FIRST. YOU HEAR [sic] HEARD COUNSEL'S STATEMENT ABOUT WHAT HE PROPOSES HE WOULD LIKE TO DO.
MR. ROBEIN: I HAVE ON CLARIFICATION IN CONNECTION WITH THAT. THE PHONE CALLS WERE ANONYMOUS PHONE CALLS AND THERE IS ABSOLUTELY NO EVIDENCE OF THE IDENTITY OF THE CALLERS; IS THAT CORRECT?
MR. MARCELLO: I SHOULD CLARIFY THIS. THERE WAS A TELEPHONE CALL WHERE THE IDENTITY OF THE CALLER IS KNOWN, AND THAT CALLER WAS MR. LAWRENCE LEDET, WHO IS PREPARED TO TESTIFY HERE TODAY THAT MR. LEROY HIMEL INDICATED TO HIM ON THE DAY OF OR THE DAY BEFORE THE ACCIDENT THAT THE UNION MEN WERE GOING TO KILL DONALD WILLIS.
MR. ROBEIN: AND THAT WAS EXCLUDED UNDER THE
MR. MARCELLO: THAT WAS EXCLUDED UNDER AN EARLIER RULING. I'M SIMPLY PROFFERING HIS TESTIMONY NOW. IF YOUR HONOR WISHES, MAYBE WE CAN PROFFER THE ACTUAL TESTIMONY. IT MIGHT BE A LOT BETTER FOR APPELLATE PURPOSES, BECAUSE IF I UNDERSTAND THE RULE, IF YOU JUST MAKE AN ORAL PROFFER AND SAY YOU ARE GOING TO PROVE, THEN THE COURT HAS TO REMAND THE CASE FOR THE ACTUAL TESTIMONY. WE CERTAINLY DON'T WANT TO DO THAT.
THE COURT: THAT'S CORRECT. IT'S GOOD TO PUT IT IN. LET THE RECORD SHOW THAT IT WAS ORDERED EXCLUDED IN PRETRIAL BECAUSE OF THE MISUNDERSTANDING, FOR WANT OF A BETTER WORD, WITH RESPECT TO THE WITNESS LIST AND THE DEPOSITION AT WHICH COUNSEL WASN'T PRESENT.
MR. MARCELLO: THAT'S CORRECT, YOUR HONOR. WE'RE TALKING ABOUT MR. YEAGER TESTIFYING, ALSO, WHILE WE'RE MAKING THE RECORD
THE COURT: THAT WAS MR. YEAGER WE WERE TALKING ABOUT. THIS WAS MR. HIMEL, WASN'T IT?
MR. MARCELLO: THAT'S RIGHT.
MR. ROBEIN: MR. HIMEL TOLD MR. YEAGER WHO TOLD MR. WILLIS. THAT'S THE SEQUENCE.
THE COURT: ALL RIGHT, I'LL ORDER THAT EXCLUDED. WHAT'S NEXT?
MR. MARCELLO: WE'LL MAKE A PROFFER ON THAT LATER.
The trial court recessed for the day with Willis still on the witness stand.
At the beginning of the proceedings on June 30, 1989, the following occurred:
MR. MARCELLO: JUDGE, I'VE PREPARED A MEMORANDUM OF UNDERSTANDING, ESSENTIALLY WHAT I BELIEVE TO HAVE BEEN THE RULING OF THE COURT. I'M A LITTLE LEERY ABOUT DICTATING PROFFERS AND OFFERS OF PROOF AND OBJECTIONS INTO THE RECORD. I JUST WANT TO MAKE SURE THAT I HAVE A COMPLETE UNDERSTANDING WITH YOUR HONOR AND WITH OTHER COUNSEL AS TO WHAT I PLAN TO DO, AND THE FACT THAT THESE THREE ITEMS WERE EXCLUDED. I WOULD ASK THE COURT, IS THIS A FAIR REPRESENTATION OF WHAT I CANNOT DO?
MR. SMITH: YOUR HONOR, I WOULD OBJECT TO THAT PROCEDURE. I THINK THERE ARE PLENTY OF POINTS TO PUT ON A PROFFER. HE'S ENTITLED TO PUT ON A PROFFER. IF THIS IS HIS PROFFER, HE CAN PUT IT IN. WE CERTAINLY DO NOT AGREE THAT IT IS A MEMORANDUM OF ALL OF OUR UNDERSTANDING. IT MAY BE A MEMORANDUM *472 OF THE PLAINTIFF'S UNDERSTANDING, BUT
THE COURT: I HAVE NEVER TRIED A LAWSUIT WITH A MEMORANDUM OF UNDERSTANDING, MR. MARCELLO. I WANT THIS THING TO GO SMOOTHLY. I DON'T KNOW WHAT YOU'RE AFTER. WE HAD SOME PRELIMINARY MATTERS; WE'VE HAD SOME RULINGS. I WOULD SUGGEST THAT WE PROCEED.
MR. MARCELLO: WHAT I NEED TO KNOW, OUT OF THE PRESENCE OF THE JURY, YOUR HONOR, IS, CAN I ASK MR. WILLIS IF HE HAD A TELEPHONE CONFERENCE WITH LAWRENCE LEDET THE DAY BEFORE THE ACCIDENT, AND ASK HIM WHAT LAWRENCE LEDET TOLD HIM.
THE COURT: THAT IS MY UNDERSTANDING, THAT THAT WAS THE SUBJECT OF THE FIRST CONFERENCE WE HAD, AND IT WAS RULED THAT YOU COULD NOT. THERE IS NOT SUPPOSED TO BE ANY FURTHER QUESTION ABOUT THAT WHATSOEVER.
MR. MARCELLO: BUT THE REASON FOR MY CONFUSION IS THAT MR. LEDET WAS ON THE PRETRIAL ORDERS, AND HE HAS BEEN ON THE PRETRIAL ORDERS SINCE THE BEGINNING OF THE CASE.
MR. REED: YOUR HONOR, I DON'T THINK YOU EXCLUDED MR. LEDET FROM TESTIFYING; YOU SIMPLY EXCLUDED THAT TESTIMONY.
THE COURT: THAT IS MY UNDERSTANDING.
MR. MARCELLO: SO, IT IS MY UNDERSTANDING THAT DONALD WILLIS CANNOT SAY HE TALKED TO LAWRENCE LEDET THE DAY BEFORE THE ACCIDENT AND LAWRENCE LEDET INFORMED HIM THAT HIS LIFE WOULD BE THREATENED. IS THAT CORRECT?
THE COURT: MY UNDERSTANDING IS THAT THAT WAS EVERYBODY'S UNDERSTANDING YESTERDAY MORNING AT THIS TIME.
MR. MARCELLO: AND FOR THE RECORD, I UNDERSTAND THAT I CANNOT ASK HIM ABOUT ANY THREATENING TELEPHONE CALLS HE RECEIVED ANONYMOUSLY AT HIS HOUSE REGARDING KILLING HIM, RAPING HIS WIFE, AND RAPING HIS CHILD?
THE COURT: YOU ALREADY ASKED HIM THAT.
MR. MARCELLO: I DIDN'T ASK HIM THAT IN THE TESTIMONY.
THE COURT: SURE, YOU ASKED HIM THAT. WELL, EITHER YOU ASKED HIM OR HE MANAGED TO GET IT IN.
MR. MARCELLO: THE RECORD WILL REFLECT THAT I ASKED HIM WHAT THREATS HE RECEIVED ON THE PICKET LINE, BECAUSE YOUR HONOR CONFINED ME TO WHAT WAS SAID ON THE PICKET LINE. NOW, IF MR. WILLIS CAN TESTIFY TO THAT, I CERTAINLY WANT TO GET THAT INTO EVIDENCE.
MR. ROBEIN: HE DID TESTIFY TO THAT.
MR. MARCELLO: ON THE PICKET LINE. THIS WAS AT HIS HOUSE. I WANT TO KNOW IF I CAN ASK HIM IF HE RECEIVED ANY THREATS AT HIS HOUSE.
MR. ROBEIN: I HAVE TO OBJECT. I WILL REASSERT THE OBJECTION IN THE EVENT IT'S NOT ON THE RECORD FROM YESTERDAY. THAT APPLIES TO THE UNION. IT WAS OUR OBJECTION THAT THAT COULD NOT GO IN BECAUSE THE UNION, LIKE ANY OTHER ENTITY IN THESE UNITED STATES AND IN THIS WORLD CANNOT DEFEND AGAINST AN ANONYMOUS PHONE CALL.
MR. MARCELLO: AND THAT IS ALSO IN THIS MEMORANDUM, IF I'M UNDERSTANDING, JUST SO THE RECORD IS CLEAR. THE TESTIMONY WAS ABOUT THE THREATENING TELEPHONE CALLS THAT I PREVIOUSLY INDICATED AND, ALSO, PEOPLE RIDING UP AND DOWN IN *473 FRONT OF HIS HOUSE WITH GUNS IN THEIR CARS.
MR. ROBEIN: AND PEOPLE THAT HE DOES NOT KNOW. HE CANNOT IDENTIFY THEM.
MR. MARCELLO: MY POINT IS, YOUR HONOR, THIS ALL GOES TO HIS STATE OF MIND AT THE TIME THAT THE PAINT HIT HIS FACE. I JUST WANT TO MAKE CLEAR THAT I'M BEING INSTRUCTED THAT HE CANNOT TESTIFY AS TO THESE THINGS.
MR. SMITH: I THINK IT'S BEEN MADE CLEAR A DOZEN TIMES. I THINK WE OUGHT TO GO AHEAD.
THE COURT: I DON'T WANT TO EXCLUDEI CAN UNDERSTAND, MR. MARCELLO, AND GOODNESS KNOWS HOW MANY TIMES I'VE SAID ITI CAN UNDERSTAND THAT STATE OF MIND IS PART OF YOUR CASE AND I CAN UNDERSTAND WHAT YOU WANT TO SHOW. I CAN ONLY EMPHASIZE THAT YOU HAVE TO DO IT WITHIN THE PROPER RULES OF EVIDENCE. THAT IS ALL I HAVE TRIED TO TELL YOU. YOU HAVE TO DO IT WITHIN THE RULES OF EVIDENCE AND WITHIN THE RULING THAT WE'VE MADE INSOFAR AS THE PRETRIAL ORDER AND WHAT TRANSPIRED WITH THAT.
MR. MARCELLO: THAT'S FINE, I JUST WANT TO MAKE SURE THAT THAT'S THE RULING OF THE COURT AT THE PRESENT, AND EVIDENTIARY OBJECTION, THESE MATTERS CANNOT BE PUT INTO EVIDENCE. WOULD YOU LIKE TO HAVE THE
THE COURT: I DON'T KNOW WHY IT'S GOT TO TAKE THIS TURN. IF YOU WANT TO ASK THIS MAN, DID TEN FELLOWS WITH ARMED SHOTGUNS PATROL HIS HOME ON A 24-HOUR DAY, THREATENING HIM, AND IF HE KNOWS THESE MEN AND THEY'RE ALL UNION MEN AND HE CAN IDENTIFY THEM, THEN THERE IS NO WAY ON EARTH THAT YOU WOULDN'T BE ALLOWED TO HAVE TESTIMONY ON THAT POINT. YOU KNOW THAT AS WELL AS I DO. BUT THAT'S A FAR, FAR CRY FROM WHAT I HAVE BEEN LED TO UNDERSTAND IS THE NATURE OF THE TESTIMONY THAT IS BEFORE THE COURT.
MR. ROBEIN: NOW I'M NOTICING HERE ALL OF A SUDDEN, WE HAVE IDENTITIES.
THE COURT: WELL, I KNOW, TOO, WHEN I MAKE A RULING, I CAN SEE THE WITNESS SHAKING HIS HEAD IN AN AFFIRMATIVE MANNER. THE WITNESS GETS EDUCATED AS WE GO ALONG. I NOTICED ALSO THAT THIS WITNESS HAS PICKED UP ENOUGH TO VOLUNTEER ON HIS OWN, A LOT OF STUFF THAT IS NOT EVEN RESPONSIVE TO THE QUESTION THAT HAS BEEN ASKED BY HIS COUNSEL. HE'S GREAT IN THE VOLUNTEER AREA. I HAVEN'T MADE AN ISSUE OF IT, AND I DON'T INTEND TO UNLESS IT'S
MR. REED: LET ME POINT OUT ONE THING, YOUR HONOR. IT'S CLEAR TO ME THAT WHAT THEY'RE GOING TO DO NOW IS, MR. WILLIS IS GOING TO GET UP ON THE STAND AND PUT IN THIS EVIDENCE THAT YOU'VE ALREADY EXCLUDED, ABOUT UNION MEN GOING UP AND DOWN HIS STREET WITH GUNS. AND THAT IS EXACTLY WHAT THIS ARGUMENT WAS ABOUT YESTERDAY MORNING, IN THAT YOU GAVE MR. MARCELLO AN OPPORTUNITY TO EITHER TRY THIS CASE, CONTINUE IT, SEVER IT. AND THE REASON YOU WERE GOING TO SEVER IT
THE COURT: NO, NO. WITH RESPECT TO ANYBODY, WE DIDN'T GO INTO ALL OF THIS. IF THIS MAN CAN TESTIFY HE WAS IN A STATE OF SIEGE, THAT WOULD BE ADMISSIBLE, IF HE CAN DO IT. BUT THAT DIDN'T ENTER INTO OUR RULING OF YESTERDAY BECAUSE YESTERDAY HAD TO DO WITH THE DEPOSITIONS OF OTHER PEOPLE AND *474 WHAT THEY WOULD TESTIFY TO, THAT TYPE OF THING.
MR. REED: YOUR HONOR, I THOUGHT THAT IS WHAT WE WERE TALKING ABOUT WHEN WE WERE TALKING ABOUT SEVERING THIS CASE. BECAUSE THAT EVIDENCE ABOUT HIS PEOPLESUPPOSEDLY UNION PEOPLE BEING IN HIS FRONT YARD OR WHATEVER, ALL OF THAT SHOULD NOT BE ADMISSIBLE AS TO MR. LETULLE. THAT'S WHY YOU GAVE HIM AN OPPORTUNITY TO LET THE CASE BE SEVERED.
MR. MARCELLO: I THINK IT'S ADMISSIBLE BECAUSE IT GOES TO THE STATE OF MIND.
THE COURT: I THINK, AS FAR AS HIS STATE OF MIND, TO GO AS FAR AS I CAN GO AND BE FAIR TO EVERYBODY, I THINK HIS STATE OF MIND, INSOFAR AS HE CAN TESTIFY TO IT, SHOULD BE ALLOWED.
MR. ROBEIN: AS IT RELATES TO THE PICKET LINE.
THE COURT: TO ANYTHING.
MR. ROBEIN: WELL, YESTERDAY'S RULING, YOUR HONOR, WAS THAT IF HE WANTS TO PROVE A LABOR CONNEXITE' AS HE IS TRYING SO DESPERATELY TO DO, HE CAN TESTIFY AS TO WHAT HAPPENED ON THE PICKET LINE, BECAUSE THERE IS NO QUESTION THAT WHAT HAPPENED ON THE PICKET LINE IS SOMEHOW UNION RELATED.
THE COURT: WELL, WE MENTION PICKET LINE BECAUSE PICKET LINE WAS BEING MENTIONED.
MR. ROBEIN: THAT'S RIGHT, AND IT'S UNION RELATED. HE ALSO SUGGESTED YESTERDAY THAT HE RECEIVED ANONYMOUS PHONE CALLS. AND IT'S MY UNDERSTANDING OF YOUR HONOR'S RULE THAT HE CAN'T TESTIFY ABOUT ANONYMOUS PHONE CALLS UNLESS, UNDER THE RULES OF EVIDENCE HE CAN LINK IT TOGETHER, HE CAN PROVE IDENTITY.
THE COURT: THAT'S CORRECT.
MR. ROBEIN: NOW WE'RE BEING TOLD THAT PEOPLE WENT DRIVING BY HIS HOUSE.
THE COURT: NOT PEOPLE. IF HE CAN SHOW A STATE OF SIEGE AND IDENTIFY THE PEOPLELOOK AT HIM, HE'S NODDING HIS HEAD RIGHT NOW. HE'S REALLY GETTING WITH IT NOW. WHAT HE SAW, HE CAN TESTIFY TO.
MR. ROBEIN: IN THE DEPOSITION, HE REFUSED TO REVEAL THOSE NAMES.
THE COURT: WELL, THAT SETTLES THAT RIGHT NOW.
MR. MARCELLO: HE DIDN'T SAY HE DIDN'T KNOW WHO THEY WERE.
MR. ROBEIN: HE SAID HE WOULD REFUSE TO REVEAL THE NAMES.
MR. MARCELLO: HE CAN REVEAL THEM. YOU DIDN'T MOVE TO COMPEL.
MR. ROBEIN: I DON'T HAVE TO.
MR. MARCELLO: YES, YOU DO.
MR. ROBEIN: OH, NO, I DON'T. THAT'S YOUR CHOICE.
MR. MARCELLO: IT'S YOUR RIGHT.
MR. ROBEIN: IT'S YOUR CHOICE.
MR. MARCELLO: I DID NOT INSTRUCT HIM NOT TO ANSWER. YOU GOT YOUR ANSWER.
MR. ROBEIN: NOR DID YOU INSTRUCT HIM TO ANSWER.
MR. MARCELLO: AND YOU DID NOT MOVE TO COMPEL. YOU HAVE TO DO THAT.
MR. ROBEIN: NO, NO.
THE COURT: THAT'S THE END OF THAT.
MR. MARCELLO: I HAVE TO OBJECT, YOUR HONOR. HE HAS A PERFECT RIGHT TO DO ALL OF THE DISCOVERY HE WANTS BEFORE TRIAL, AND THERE IS A TOOK HE CAN USE CALLED A MOTION TO COMPEL DISCOVERY, WHICH HE COULD HAVE FILED AND FOUND OUT WHO THOSE GENTLEMEN WERE, AND HE DIDN'T DO IT. THAT'S HIS PROBLEM.

*475 THE COURT: OKAY, YOU'VE MADE YOUR OBJECTION AND YOUR OBJECTION IS OVERRULED. WHEN HE MAKES HIS OBJECTION AT THE PROPER TIME, IT WILL BE SUSTAINED.
ANYTHING ELSE?
MR. MARCELLO: I WOULD LIKE TO CLARIFY SOMETHING, ALSO. I THINK YOUR HONOR SAID THAT HE CAN TESTIFY THAT HE THOUGHT HE WAS IN A STATE OF SIEGE; IS THAT CORRECT? AM I CORRECT IN UNDERSTANDING THAT?
THE COURT: I'M NOT GOING TO DICTATE HIS TESTIMONY FOR HIM. I MERELY USED, AS AN EXAMPLE, IN FAIRNESS TO YOUR CLIENT, IF HE WAS IN A WRETCHED STATE OF MIND, HE CAN RECITE THE FACTS THAT PUT HIM IN THAT STATE OF MIND, IF HE COULD AND WOULD RECITE THE FACTS. YOU JUST EXCLUDED YOURSELF FROM SOME OF THE FACTS THAT YOU'RE TALKING ABOUT. HE IS NOT GOING TO GET UP HERE WITH GENERALITIES. I THINK THE BEST WAY TO DO IT IS JUST PROCEED. I DON'T THINK I CAN MAKE IT ANY CLEARER.
MR. MARCELLO: ALSO, I NEED TO CLARIFY SOMETHING. THERE WAS A MISCHARACTERIZATION OF WHAT IS GOING ON. MR. ROBEIN SAID THAT YOUR HONOR'S ORDER PERTAINED TO ANY ANONYMOUS TELEPHONE CALLS. AS I UNDERSTAND, IT ALSO PERTAINS TO MR. LEDET'S TELEPHONE CALL.
The substance of the evidentiary rulings made by the trial court on June 21 and 29, 1989, and the reasons therefor, are essential to ruling on assignments of error 6 and 7. The best evidence of those rulings, and the reasons therefor, would be a transcript or narrative of facts of the proceedings at which the rulings were made and the reasons given. The record before us does not have either. A review of the pertinent portions of the transcript set out herein shows that the parties and the trial court are not in agreement about (1) the substance of the rulings and the reasons therefor, (2) whether Willis contemporaneously objected to the rulings, as required by La.C.C.P. art. 1635, or (3) whether the objections were waived by agreement. We have been ordered by the Louisiana Supreme Court to decide this case on the record and, thus, may not remand for an evidentiary hearing to reconstruct the record. Further, the record is unclear about what rulings, if any, were made by the trial court, and/or what agreements were entered into between the parties, on June 21, 1989, because there is no transcript or narrative of facts for the proceedings on that date. In this procedural posture, we will apply the rule that the inadequacy of a record is imputable to the appellant (Willis). Thompson, 532 So.2d at 527. The inadequacy of an appellate record for which an appellant is responsible cannot operate to the detriment of an appellee. Thompson, 532 So.2d at 527. When the record does not contain an adequate transcript, narrative of facts or other satisfactory evidence, an appellate court can apply the presumption that the trial court's judgment is correct and affirm. La.C.C.P. arts. 2130 and 2131; La.R.S. 15:432; Ronald Adams, Contractor, Inc. v. State, Department of Transportation and Development, 464 So.2d 1003 (La.App. 1st Cir. 1985). We do so for these assignments of error.
Further, we have reviewed the proffered testimony of Willis and Yeager and, even if it is considered by us, the result we reach will be the same.[2]
These assignments of error are without merit.

FAULT OF WILLIS AND LETULLE

(Assignment of error 5)
Willis asserts the "trial court committed manifest error in failing to find that *476 LeTulle [sic] was one hundred percent responsible for running Willis off the road."
The facts of this case are set forth in Willis v. Letulle, 581 So.2d at 1049-1050.
The law applicable in determining the fault of Willis and Letulle is found in Smith v. English, 586 So.2d 583 (La.App. 2nd Cir.), writ denied, 590 So.2d 80 (La. 1991). English was the owner of an automobile which was stolen by DeGarmo. English enlisted the aid of Hawkins to pursue DeGarmo in Hawkins' automobile. An extended high speed chase ensued. DeGarmo ran a stop sign at an intersecting road and struck another vehicle owned by Garner and in which Smith was a passenger. The trial court found DeGarmo, English and Hawkins at fault. Fault was allocated 50% to DeGarmo, 30% to English and 20% to Hawkins. The court of appeal affirmed these holdings and observed, in pertinent part, as follows at 586 So.2d at 589:
The driver of a motor vehicle on a road or highway owes a duty to other motorists to drive reasonably and carefully under the circumstances to protect them from injury. Callais v. Allstate Ins. Co., 334 So.2d 692 (La.1976); Andersen v. Craig, 401 So.2d 1022 (La.App. 4th Cir.1981). The trial court reasonably found that English and Hawkins, in their effort to recover English's property, owed the duty to do so in a manner that would not create an unreasonable risk of harm to the public. See Edwards v. State, 556 So.2d 644 (La.App. 2d Cir. 1990). The trial court's finding is not plainly wrong.

Breach of Duty
Appellants contend that even if they owed a duty to these plaintiffs, they did not breach it. They rely partly on La. C.Cr.P. art. 214, which permits a private person to arrest anyone who has committed a felony, whether the felony was committed in or out of the private person's presence. They also cite La.R.S. 32:24, which allows the driver of an authorized emergency vehicle, when in pursuit of an actual or suspected law violator, to reasonably disregard certain regulations of the road when such vehicle is using prescribed audible or visible signs.
The trial court astutely observed that while a private person may arrest a felon under art. 214, he may not resort to unreasonable means that endanger innocent third parties. See La.C.Cr.P. arts. 220, 215 C. Likewise, the grant of authority of R.S. 32:24 could not avail the appellants; Hawkins's father's Olds Omega was not an "authorized emergency vehicle" and Hawkins, a 16-year old minor at the time, was not specially trained for the use of such a vehicle. Even so, drivers of such vehicles are neither relieved of the duty to "drive with due care for the safety of all persons" nor insulated "from the consequences of [their] reckless disregard for the safety of others." See Kaplan v. Lloyds Ins. Co., 479 So.2d 961 (La.App. 3d Cir.1985).
The court indicated that under the circumstances here presented it was perhaps not unreasonable for English and Hawkins initially to attempt to thwart Ms. DeGarmo's theft of the Suburban. However, the court felt that after the initial attempt proved futile, a reasonable person should have realized this and not embarked on a protracted high-speed chase over treacherous country roads. Notably, English and Hawkins recognized that Ms. DeGarmo was driving recklessly and they should have anticipated that their continued pursuit would make her even more heedless of traffic laws. See Bolden v. Winn Dixie, 513 So.2d 341 (La.App. 4th Cir.), writ denied 514 So.2d 1177 (1987).
The factors to be considered when determining the fault of the parties are set forth in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985) as follows:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, *477 (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Letulle initiated the course of conduct that ensued between him and Willis. His intentional act of throwing the paint-filled egg at the vehicle being driven by Willis constituted the criminal offense of simple criminal damage to property, a violation of La.R.S. 14:56, and arguably a simple battery on Willis, a violation of La.R.S. 14:35. Willis initially had good cause to pursue Letulle and determine his identity for purposes of civil and criminal sanctions. However, Willis had an obligation to pursue in such a manner that he would not create an unreasonable risk of harm to the public, and only for as long as it was reasonable to do so. After Willis identified Letulle and/or his vehicle, protracted pursuit became unreasonable. During the pursuit, Letulle was also under a duty not to create an unreasonable risk of harm to the public. After reviewing the pertinent facts of this case, we conclude that Willis and Letulle operated their vehicles recklessly and were equally at fault. We allocate the fault at 50% to each.
This assignment of error has some merit.

FAULT OF THE UNION

(Assignment of error 2)
The facts of this case pertaining to the fault of the Union are set forth at Willis v. Letulle, 581 So.2d at 1057-1059. After reviewing the record, we conclude that Willis has failed to prove by clear and convincing evidence that the Union actually participated in, actually authorized, or actually ratified (after knowledge thereof), the acts of Letulle.

QUANTUM

(Assignment of error 4)
On the day of the accident Willis was admitted to the emergency room of Riverview Medical Center in Gonzales, Louisiana, complaining of head and back pain. He was released the same day after x-rays were taken. Shortly thereafter Willis began suffering pain in his lower back which radiated down his right leg. Willis testified that he was treated by a chiropractor for a period of two weeks but did not get any relief for his pain. Willis was admitted to Riverview Medical Center on January 8, 1987, and was examined by Dr. Richard Streb. After administering a CT scan and a straight leg raising test, Dr. Streb concluded that Willis was probably suffering from a ruptured disc at the L4-5 level. Willis was treated conservatively with traction and released from the hospital on January 12, 1987.
Willis subsequently consulted a neurologist, Dr. John Clifford, who administered a lumbar myelography that confirmed the presence of a ruptured disc at L4-5. On March 4, 1987, Dr. Clifford performed a discectomy, which involved the partial removal of the disc and no spinal fusion. Dr. Clifford testified that Willis has done "fairly well" since the operation and does not anticipate the need for future surgery. Dr. Clifford also testified that Willis should avoid lifting objects that weigh over thirty pounds and avoid excessive bending, stooping, squatting and climbing.
Willis testified that he continues to experience back pain except when he visits his farm in Mississippi. Dr. Clifford testified that Willis told him that he did not attend physical therapy sessions because he had been deer hunting and had killed several.
Willis is the owner of Willis Barge Cleaning and Repair, Inc. (Willis Barge) which has been in existence since 1979. At the time of the accident he employed forty to fifty people. Willis claims that, in addition to his supervisory functions, he personally performed some of the manual labor of Willis Barge. Willis' personal income and the gross income of Willis Barge for the years 1983 to 1988 are as follows:

*478
 Willis Barge Donald Willis
1983 $ 361,000 $22,293
1984 $ 352,000 $ 7,038
1985 $ 522,000 $15,000
1986 $ 854,000 $44,000
1987 $1,137,000 $68,000
1988 $1,119,000 $79,750

Willis claims that he could have earned more money had he not been limited by the physical disability caused by the accident. Willis did not call an economist or other expert to testify about his loss of income and/or earning capacity. No witness has assigned a disability rating to Willis for his injuries.

Medical Expenses
Willis' medical bills attributable to the accident up to the time of trial were $7,628.88. On appeal, Willis has not asked for future medical expenses. We therefore award damages for medical expenses in the amount of $7,628.88.

Loss of Earnings and/or Earning Capacity
While plaintiff's earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Damages should be estimated on the injured party's ability to earn money, rather than what he actually earned before the injury. Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. Hobgood v. Aucoin, 574 So.2d 344 (La. 1990).
The facts in Hobgood are very similar to those in the present case. Hobgood, who suffered a back injury in an automobile accident, owned a oil well service business. Although he continued to work after the accident, he could no longer work as hard as he could before the accident. Hobgood's income increased after suffering the injury. Hobgood's economist based his findings on unsupported data; therefore, his testimony was not considered in making a determination as to the amount of the award for lost earning capacity. In affirming an award of $50,000 for lost earning capacity, the Louisiana Supreme Court used following reasoning:
Yet, certainly plaintiff's inability to pursue his business as vigorously and energetically as he did prior to injury shows that his ability to earn has been impaired. It is reasonable to conclude that plaintiff could earn more money if he did not have his present physical limitations. However, the record contains little evidence that is helpful in determining the amount of an appropriate award, distinguishing this case from those discussed above where expert testimony and corroborating evidence established specific figures and probabilities from which an amount could be calculated with some degree of mathematical certainty. Here, the loss of earning capacity, although proved in a general sense, is highly speculative as to value or amount. Given the limited evidence of the economic impact of plaintiff's partial disability on his earning capacity or ability, we conclude that the court of appeal did not abuse its discretion in fixing the amount of damages for loss of earning capacity at $50,000. Hobgood v. Aucoin, 574 So.2d at 348.
Using this reasoning, we conclude that Willis is entitled to an award for lost earnings and lost earning capacity in the amount of $50,000.

General Damages
After reviewing the trial record, we conclude that Willis is entitled to general *479 damages in the amount of $75,000. See, for example, Naman v. Schmidt, 541 So.2d 265 (La.App. 4th Cir.1989) ($95,000 in general damages awarded to plaintiff with ruptured lumbar disc along with shoulder separation); Bergeron v. K-Mart Corp., 540 So.2d 406 (La.App. 1st Cir.), writs denied, 544 So.2d 408, 412 (La.1989) ($60,000 awarded for plaintiff with two herniated cervical discs); Soudelier v. Miller, 537 So.2d 296 (La.App. 1st Cir.1988) ($60,000 for a ruptured cervical disc); Redondo v. Consolidated Freightways Corporation of Delaware, 529 So.2d 1296 (La.App. 4th Cir.), writ denied, 533 So.2d 363 (La. 1988) ($100,000 award for pain and suffering, mental anguish and permanent disability for plaintiff with ruptured lumbar disc); Jinks v. Wright, 520 So.2d 792 (La.App. 3rd Cir.1987) ($35,000 award for pain and suffering and mental anguish for plaintiff who underwent lumbar discectomy and arthroscopic knee surgery).

Conclusion
Willis suffered damages valued at $132,628.88. This amount must be reduced by 50% to $66,314.44. This amount is subject to a credit of $30,000 which represents the liability insurance coverage on the amount due. See Jordan v. Sweeney, 467 So.2d 569, 572, n. 2 (La.App. 1st Cir.), writ denied, 469 So.2d 985 (La.1985). Thus, Willis is entitled to a judgment against Allstate for $36,314.44.

DECREE
For the foregoing reasons, the judgment of the trial court granting a directed verdict in favor of the Union is reversed, and judgment is rendered on the merits in favor of the Union and against Willis dismissing Willis' petition against the Union with prejudice. The judgment of the trial court in favor of Allstate is reversed, and judgment is rendered in favor of Willis and against Allstate in the sum of $36,314.44, with legal interest thereon from date of judicial demand until paid. Allstate is cast for all costs, subject to a credit of $1,750.
REVERSED AND RENDERED.
SHORTESS, J., concur in all respects except quantum. I feel the award of general damages is unreasonably low and would award more.
CRAIN, J., concurs. I agree we were not reversed by the Supreme Court, simply ordered to decide the case. Under these circumstances I do not necessarily agree that Ragas has been overruled.
NOTES
[1] Because we are determining the facts of this case de novo, assignments of errors 1, 9, 10, 11 and 12 concerning various trial court jury charges and the conduct of the trial judge during the trial are moot.
[2] The proffered testimony of Willis and Yeager is attached hereto as unpublished appendices A and B.